ED ZAAGMAN, INC v CITY OF KENTWOOD

TURKISH v CITY OF WARREN

Docket Nos. 57225, 57342. Argued October 5, 1976 (Calendar Nos. 6, 7).—Decided March 27, 1979.

---

References for Points in Headnotes

[1, 3] 82 Am Jur 2d, Zoning and Planning §§ 27, 354.

[2] 82 Am Jur 2d, Zoning and Planning §§ 25, 259.

[4] 82 Am Jur 2d, Zoning and Planning §§ 272-274.

[5] 82 Am Jur 2d, Zoning and Planning § 358.

  5 Am Jur 2d, Appeal and Error § 822.

[6] 82 Am Jur 2d, Zoning and Planning §§ 272-274, 361.

  Exclusionary zoning. 48 ALR3d 1210.

  Validity of zoning regulations prescribing minimum area for house lots or requiring an area proportionate to number of families to be housed. 95 ALR2d 716.

[7] 82 Am Jur 2d, Zoning and Planning §§ 327, 360, 361.

[8] 82 Am Jur 2d, Zoning and Planning §§ 352, 356, 360.

[9] 82 Am Jur 2d, Zoning and Planning §§ 259, 339.

[10] 82 Am Jur 2d, Zoning and Planning §§ 31, 76, 259.

  Spot zoning. 51 ALR2d 263.

[11] 82 Am Jur 2d, Zoning and Planning § 361.

  Exclusionary zoning. 48 ALR3d 1210.

[12] 82 Am Jur 2d, Zoning and Planning §§ 358, 361.

[13] 82 Am Jur 2d, Zoning and Planning §§ 11, 13-15, 27, 308.

[14] 82 Am Jur 2d, Zoning and Planning §§ 282, 283, 322-324, 339, 340, 353.

[15] 82 Am Jur 2d, Zoning and Planning §§ 49, 55, 60 et seq.

[16] 82 Am Jur 2d, Zoning and Planning § 18.

[17] 82 Am Jur 2d, Zoning and Planning § 361.

[18] 82 Am Jur 2d, Zoning and Planning §§ 352-356.

[19] 82 Am Jur 2d, Zoning and Planning §§ 358-360.

  5 Am Jur 2d, Appeal and Error § 839.

[20] 82 Am Jur 2d, Zoning and Planning §§ 13, 35, 273.

  27 Am Jur 2d, Eminent Domain §§ 289, 442.

[21] 82 Am Jur 2d, Zoning and Planning §§ 5, 13, 15, 36.

  27 Am Jur 2d, Eminent Domain §§ 289, 442.

  Exclusionary zoning. 48 ALR3d 1210.

[22] 82 Am Jur 2d, Zoning and Planning §§ 15, 36, 346.

[23] 82 Am Jur 2d, Zoning and Planning §§ 47, 283, 296 et seq.

[24] 82 Am Jur 2d, Zoning and Planning §§ 334-337.

Ed Zaagman, Inc., a land developer, sought an injunction against the City of Kentwood to restrain the enforcement of the defendant's zoning ordinance as it applied to the plaintiff's land. The Kent Circuit Court, George V. Boucher, J., granted judgment for the plaintiff. The Court of Appeals, T. M. Burns, P.J., and McGregor and D. F. Walsh, JJ., reversed (Docket No. 19381). Plaintiff appeals.

Michael C. Turkish and Marilyn C. Turkish challenged the constitutionality of the City of Warren's zoning ordinance as applied to the plaintiffs' property and the defendant's refusal to rezone the property to permit its use for multiple-family dwellings. The Macomb Circuit Court, Frank E. Jeannette, J., granted the plaintiffs a declaratory judgment and injunctive relief. The Court of Appeals, J. H. Gillis, P.J., and Quinn and R. M. Maher, JJ., affirmed (Docket No. 20408). Defendant appeals. *Held:*

The Court agreed unanimously that in *Zaagman* the plaintiff has not established that the zoning ordinance as applied to the plaintiff's property was unconstitutional and that in *Turkish* the zoning ordinance was unconstitutionally confiscatory as applied. The Court disagreed, however, upon the procedure to be followed upon remand. Justice Williams, with Chief Justice Coleman and Justices Fitzgerald and Ryan concurring, wrote the majority opinion determining the effect of a judicial declaration that a zoning ordinance is invalid and the procedure to be followed. He wrote:

1. The previously announced rules of *Kropf v Sterling Heights,* 391 Mich. 139; 215 NW2d 179 (1974), and *Kirk v Tyrone Twp,* 398 Mich 429; 247 NW2d 848 (1976), remain the law as the appropriate standard for determining the constitutional validity of zoning ordinances. For an ordinance to be successfully challenged a plaintiff must prove: First, that there is no reasonable governmental interest being advanced by the present zoning classification itself or second, that an ordinance may be unreasonable because of the purely arbitrary, capri-

---

[25] 82 Am Jur 2d, Zoning and Planning § 103.

[26] 82 Am Jur 2d, Zoning and Planning §§ 8, 101 *et seq.*
Exclusionary zoning. 48 ALR3d 1210.

[27] 82 Am Jur 2d, Zoning and Planning §§ 7, 39-46.
Spot zoning. 51 ALR2d 263.
Validity of zoning ordinance or similar public regulation requiring consent of neighboring property owners to permit or sanction specified uses or construction of buildings. 21 ALR2d 551.

[28] 82 Am Jur 2d, Zoning and Planning §§ 15, 34, 36, 103.
. 54 Am Jur 2d, Mobile Homes, Trailer Parks, Tourist Camps § 13.
Exclusionary zoning. 48 ALR3d 1210.

cious and unfounded exclusion of other types of legitimate land use from the area in question.

2. The four rules for applying these principles are: 1) The ordinance comes clothed with every presumption of validity. 2) It is the burden of the party attacking to prove affirmatively that the ordinance is an arbitrary and unreasonable restriction upon the owner's use of property. It must appear that the clause attacked is an arbitrary fiat, a whimsical *ipse dixit,* and that there is no room for a legitimate difference of opinion concerning its reasonableness. 3) To sustain an attack on a zoning ordinance, an aggrieved property owner must show that if the ordinance is enforced the consequent restrictions on property preclude its use for any purposes to which it is reasonably adapted. 4) Considerable weight is given to the findings of the trial judge in equity cases.

3. The decision of the Court of Appeals in *Zaagman* is affirmed on the ground that the plaintiff has failed to meet its burden to affirmatively prove that either the defendant city's ordinance is arbitrary and unreasonable or that no governmental interest is advanced by the present zoning classification. The plaintiff has not established a case for either a denial of substantive due process or denial of equal protection.

4. A review of the record in *Turkish* supports the trial court's finding that the zoning ordinance is confiscatory as applied to the plaintiffs. The defendant's platting of surrounding land has landlocked the plaintiffs' parcel to the extent that all reasonable uses are precluded under the present zoning designation, single-family dwellings. The plaintiffs have affirmatively proven that their development costs under the disputed zoning ordinance would be roughly equivalent to any potential sales returns on the developed property, thereby rendering the zoning classification scheme unreasonable and void. Upon reviewing the record *de novo,* yet affording considerable weight to the findings of the trial judge in equity, the Court upheld the rulings of the lower courts. As applied to the plaintiffs' property, the single-family zoning classification of the defendant City of Warren is unreasonable, arbitrary and confiscatory, thereby rendering the disputed zoning constitutionally invalid.

5. The remaining issues concern the effect of the determination of unconstitutionality in *Turkish* and the procedure to be followed upon remand. Specifically, the questions are: whether the plaintiffs may construct any structure within the R-3 classification, *e.g.,* garden apartments, a two-and-one-half story apartment house, a storage building, or a church, or only that specific use prescribed at trial, multiple-family units; and the

type of hearing which is required for review of zoning determinations. The Court rejected the approach of remanding to an appropriate administrative body for a full administrative or quasi-judicial determination of the use to be made by the aggrieved landowner. Instead, after a judicial declaration that the zoning is unconstitutional, enforcement of the disputed zoning ordinance will be enjoined and the matter remanded to the municipal zoning body to present, for the trial court's consideration within 60 days of the judicial order declaring the unconstitutionality, an adopted amendatory ordinance comporting with the dictates of equity as well as the requirements of constitutional reasonableness as applied to the plaintiff's parcel.

6. To permit an administrative hearing upon remand which is not subject to *de novo* review would impermissibly invade the Court's powers and place a successful litigant in the precarious position of seeking to establish its proposed use before an adversely interested litigant (in this case the City of Warren) without the benefit of subsequent judicial consideration except where the decision is not supported by substantial evidence on the record. To permit a plaintiff to first challenge a zoning classification in an administrative proceeding would impermissibly encroach upon the presumption of legislative validity as well as the doctrine of separation of powers. The administrative approach can only invite countless zoning challenges, many of which must proceed to the courts for a dispositive adjudication. The net result would increase rather than relieve the burden on the courts. The burden on zoning bodies would likewise be magnified. Further, the authority of a zoning body's legislative action would likely be debased concomitantly to the extent that every affected property owner could challenge that authority, not on the basis of the value of the constitutionally valid zoning classification to the general public but on the basis of its value to the individual property owner regardless of the general welfare. The administrative approach to zoning review would undoubtedly destroy both the necessity and desirability of representative legislative action as well as reduce determinations on land use to a "what's-in-it-for-me" or spot zoning scheme generally eschewed as not being in the public interest.

7. The determination that the ordinance as applied to the Turkish parcel is unconstitutional should not mean that the Turkishes are necessarily entitled to use the property for multiple-family residences. The surrounding owners have an interest in how the Turkish property is developed, as does the City of Warren in providing for the orderly development of

land, consistent with its master plan, in order to provide adequate services and to protect aesthetic and environmental values. Accordingly, the majority generally accepts the view that even though the Turkishes' proposed use may appear to be "reasonable", there may be other feasible means of developing single-family homes on the parcel if the city permits variances regarding street width and lot size or under other circumstances. The parcel might also be used, consistent with the present zoning, for schools, religious institutions, or some other use. Although uses consistent with the present zoning may not be feasible, it may be that uses other than multiple-family residences are both feasible and more compatible with competing interests.

8. Five alternative methods of judicial action subsequent to a judicial finding of constitutional invalidity have been suggested: 1) leave the parcel unzoned either until a use is instituted by the plaintiff or the parcel is rezoned; 2) enjoin the defendant from enforcing a zoning classification other than that classification urged by the plaintiff and determined appropriate by the Court; 3) enjoin the defendant as in 2) and affirmatively order the institution of the plaintiff's proposed specific use of the parcel; 4) enjoin the defendant from enforcing the unconstitutional classification but remand the matter to the appropriate municipal zoning authority to present for the chancellor's consideration, within 60 days of the order of unconstitutionality, an adopted amendatory ordinance comporting with the dictates of equity as well as the requirements of constitutional reasonableness as applied to the aggrieved landowner's parcel; 5) remand exclusively for an administrative hearing to determine an appropriate use of the plaintiff's parcel. The Court adopts alternative 4) after finding the others unacceptable for various reasons.

9. Upon presentation by the defendant city of the adopted amendatory zoning ordinance the trial court shall enter one of the following orders:

(i) If the parties find the adopted amendatory ordinance mutually acceptable, the trial court shall order the implementation of such "midsatisfactory" amendatory ordinance.

(ii) If, after remand to defendant city council, defendant submits an adopted amendatory ordinance unacceptable to plaintiff but embodying the "midsatisfactory use" as determined by the trial court through a balancing of equitable considerations, that court shall order the implementation of such "midsatisfactory" amendatory ordinance.

(iii) If defendant submits an adopted amendatory ordinance

unacceptable to plaintiffs and the plaintiffs submit a proposed use embodying the "midsatisfactory use" as determined by the trial court through a balancing of equitable considerations, that court shall order the implementation of plaintiffs' proposed "midsatisfactory use".

(iv) If, after remand to defendant city council, neither party can agree upon the other's proposal and the trial court determines that neither party's proposal embodies the "midsatisfactory use", the trial court shall order the implementation of a "midsatisfactory use" after both plaintiffs and defendant as well as other affected parties have had the benefit of a hearing and the submission of proofs to determine the most equitable or "midsatisfactory use" to be made of plaintiffs' parcel.

(v) If defendant does not submit an adopted amendatory ordinance to the trial court for consideration within 60 days of the appropriate reviewing court's order of unconstitutionality, the trial court is directed to conduct a hearing supplemented by the submission of proofs by all affected parties to determine and implement the most equitable or "midsatisfactory use" to be made of plaintiffs' parcel.

If either party is dissatisfied with the chancellor's order, an appeal is permitted from that order under normal procedures of *de novo* review. The ruling in this case is to be given limited retroactive effect as to all actions hereafter commenced as well as to all actions heretofore commenced and now pending in trial or appellate courts.

Affirmed in *Zaagman*. Affirmed, as modified, and remanded in *Turkish*.

Justice Levin, joined by Justice Kavanagh, wrote:

1. The crux of the argument for regarding a change in zoning on individualized grounds as administrative is that the state cannot constitutionally make an individualized decision, quasi-judicial and affecting private rights, that is not subject to review on the merits. *Kropf* was not a direct appeal from a denial of a zoning change, but rather, as here, an action challenging the constitutionality of the zoning. The issue whether a local legislative body is acting in an administrative capacity and must observe procedures appropriate to individualized decision-making when considering such a zoning change can be duly presented and decided only in a case where an individualized change in zoning, granted or denied, is challenged *on direct appeal* on the ground that it was not supported by competent, material, and substantial evidence on the whole record.

2. While the members of the Court continue to disagree on

whether individualized zoning changes are administrative and thus subject to constitutional limitations regarding the procedures by which such decisions may be made and requirements of judicial review on the merits, they all agree in *Turkish* that 1) the owners proved that the undeveloped land could not feasibly be developed for the permitted use; 2) existing procedures, following a judicial determination of unconstitutionality, should be modified to provide the city an opportunity to show that the property should not be used as the owner proposes, because although the existing zoning is unconstitutional as applied, it does not follow that the land may be used as the owner wishes; 3) if there is more than one feasible use for the land, the city's choice should generally prevail; 4) the question of alternative feasible uses should be the subject of an evidentiary hearing, and decision should be based on the record made at that hearing; 5) the decision is subject to judicial review on the merits.

The disagreement concerns 1) whether the hearing should be conducted by the local legislative body (or someone designated by it) or by the circuit court; 2) the articulation of the standard for decision; and 3) the scope of judicial review.

3. The hearing should be conducted by or for the local legislative body, which should not make its choice before the record is developed. The judicial determination that the zoning ordinance as applied is unconstitutional should not mean that the landowner is necessarily entitled to his proposed use. The surrounding owners have an interest in how the property is developed, as does the city in providing for orderly development consistent with its master plan, with adequate services and protection of aesthetic and environmental values. The question how best to accommodate the interests of the landowner, the neighboring owners, and the city should be decided by the local zoning authority and not by a court, although it should be subject to judicial review. While many communities do not have experience in conducting administrative hearings in zoning matters, recent amendments to the zoning enabling acts now require most communities to develop a hearing capacity.

4. The standard for decision between the landowner's proposed use and the city's alternative uses should be the same as that applied in deciding whether the existing zoning is valid, reasonableness as applied to the property. Hence, if there is more than one feasible use, the city's choice, unless unreasonable as applied, should govern. Balancing of the equities is not an appropriate part of the standard. The conclusion that a zoning case sounds in equity is an offshoot of the procedural

posture of many zoning challenges on constitutional grounds; the practice has evolved of filing a bill of complaint seeking injunctive relief against enforcement of the zoning ordinance, and review has been in equity. The Court now expands this procedural concept into a substantive standard which clothes the circuit judge with the power to reject the community's choice through a balancing of equitable considerations. All that has been decided at this juncture is that the land cannot feasibly be used as zoned; a declaratory judgment to that effect could properly enter. The subsequent judicial role should be limited to a determination whether the record shows that the city has provided the landowner with a feasible alternative use that is not unreasonable as applied, and the city's decision in that regard, if adequately supported by the record, should govern.

5. The reviewing standard, even in equity cases, is no longer described as *"de novo"*. The standard in the court rules is the "clearly erroneous" standard, by which a finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. This standard relates to appellate review of a judge's findings of fact; it is not a substantive legal standard against which the facts so found are to be judged, nor does it change the scope or nature of the judicial function or of judicial review.

6. The traditional approach has been to regard all zoning changes as legislative because such changes are made by local legislative bodies, but a different approach has now been growing in acceptance, has been embodied in recommendations for revision of Michigan's zoning enabling acts, and has recently been enacted with respect to applications for special land uses and planned unit developments. That approach is premised on a perceived difference in the nature of the determination made by a local legislative body when it considers zoning charges pertaining to individual parcels of land, because in such cases it makes, in effect, an adjudication between the rights sought by the proponents and those claimed by the opponents of the change. The parties whose interests are affected are readily identifiable, and although there may be important questions of public policy, the decision has a far greater impact on one group of citizens than on the public generally. The procedures in zoning should be consonant with the nature of the function: where the function is adjudicative, concerning peculiarly the rights or property of a particular individual, the procedure should be such that the decision is based on pertinent evidence,

to which interested parties have an opportunity to respond, and it should be supported by an explanation of the reasons for decision.

7. The most controversial aspect of the administrative analysis in Michigan has been the substantive standard of review suggested in opinions in the decided cases, that even if present zoning is not unreasonable or confiscatory, a proposed use should be permitted if reasonable under all the circumstances. The "reasonableness of the proposed use" standard lends itself to the substitution of a judicial judgment for that of the local legislative body; the scope of judicial review should be confined to determining whether 1) the decision of the local legislative zoning body conforms to the substantive standard for passing on exceptions or zoning changes articulated and applied by the local legislative body; 2) the decision of the local legislative zoning body is supported by competent, material and substantial evidence; 3) the procedures followed adequately protect the rights of those concerned; 4) the decision was consistent with constitutional requirements of substantive due process and equal protection and with any master plan.

8. In *Zaagman,* the landowner's proofs tended to show that the parcel was well suited for use as a mobile-home park. Zoning is not, however, unreasonable or unconstitutional simply because it does not permit a use for which the land is suited. The landowner also argued that the zoning is invalid because the ordinance in effect excludes mobile home development from the city as a whole. While local units of government may regulate land use, they may not preclude all growth nor may they entirely exclude a particular kind of residential development. While the proofs showed that less than one percent of the area of the city was devoted to mobile-home park use and that the ratio of mobile-home units to total dwelling units was substantially less than in some nearby communities, there was testimony that the ordinance was being revised to provide for a fairly substantial mobile-home area in an entirely different section of the city, and such an area is shown on the city's general development plan. This is not a case where the Court is faced with a prohibition of a constitutionally recognized use giving rise to a prima facie case placing a heavy burden on the municipality to justify the local legislation, nor is there a suggestion that the city has refused all new applications for mobile-home use, making the prospect of future development illusory. Absent any showing that there is a pattern of refusals of applications where property is suited for mobile-home use, or any indication that the planning commission or

city commission does not consider each application on its merits and acts in accordance with an unspoken plan to deny such applications, the ordinance is not exclusionary, and the failure to permit *a* parcel to be used for mobile homes, although well suited for that purpose, does not justify a conclusion that the ordinance as applied to that parcel is unconstitutional.

61 Mich App 693; 233 NW2d 146 (1975) affirmed.

61 Mich App 435; 232 NW2d 732 (1975) affirmed, as modified.

### Opinion of the Court

1. Zoning — Ordinances — Constitutional Law.

For a zoning ordinance to be successfully challenged as unconstitutional a plaintiff must prove either that there is no reasonable governmental interest being advanced by the zoning classification itself, or that the ordinance is unreasonable because of the purely arbitrary, capricious and unfounded exclusion of other types of legitimate land use from the area in question.

2. Zoning — Ordinances — Presumption of Validity.

A zoning ordinance comes to the courts clothed with every presumption of validity.

3. Zoning — Ordinances — Burden of Proof — Reasonableness.

The party attacking a zoning ordinance has the burden to prove affirmatively that the ordinance is an arbitrary and unreasonable restriction upon the owner's use of property; it must appear that the clause attacked is an arbitrary fiat, a whimsical *ipse dixit,* and that there is no room for a legitimate difference of opinion concerning its reasonableness.

4. Zoning — Ordinances — Reasonableness.

To sustain an attack on a zoning ordinance, an aggrieved property owner must show that if the ordinance is enforced the consequent restrictions on the property preclude its use for any purposes to which it is reasonably adapted.

5. Equity — Appeal and Error — Findings of Trial Judge.

Considerable weight is given by the Supreme Court to the findings of the trial judge in equity cases.

6. Zoning — Ordinances — Constitutional Law — Reasonableness.

A single-family zoning classification is unreasonable, arbitrary and confiscatory as applied to a plaintiff's property, thereby rendering the disputed zoning constitutionally invalid, where a

review of the record *de novo* supports the trial court's finding that the zoning ordinance is confiscatory as applied to the plaintiff, the city's platting of surrounding land has landlocked the plaintiff's parcel to the extent that all reasonable uses are precluded under the present zoning designation, and the plaintiff has affirmatively proven that the development costs under the disputed zoning ordinance would be roughly equivalent to any potential sales returns on the developed property, thereby rendering the zoning classification scheme unreasonable and void (Warren Zoning Ordinance 30, art VII, §§ 7.01 *et seq.*).

7. ZONING — ORDINANCES — CONSTITUTIONAL LAW — PROCEDURE UPON REMAND — EQUITY.

The proper procedure to be followed after a judicial declaration that a zoning ordinance is unconstitutional, is that enforcement of the disputed zoning ordinance will be enjoined and the matter remanded to the municipal zoning body to present, for the trial court's consideration within 60 days of the judicial order declaring the unconstitutionality, an adopted amendatory ordinance comporting with the dictates of equity as well as the requirements of constitutional reasonableness as applied to the plaintiff's parcel.

8. ZONING — ORDINANCES — ADMINISTRATIVE LAW — COURTS.

To permit, after a judicial declaration that a zoning ordinance is unconstitutional, an administrative hearing of the local legislative body upon remand which is not subject to *de novo* review would impermissibly invade the court's powers and place a successful litigant in the precarious position of seeking to establish its proposed use before an adversely interested litigant without the benefit of subsequent judicial consideration except where the decision is not supported by substantial evidence on the record.

9. ZONING — ORDINANCES — ADMINISTRATIVE LAW — PRESUMPTION OF VALIDITY — SEPARATION OF POWERS.

To permit a plaintiff to first challenge a zoning classification in an administrative proceeding would impermissibly encroach upon the presumption of legislative validity as well as the doctrine of separation of powers; the administrative approach can only invite countless zoning challenges, many of which must proceed to the courts for a dispositive adjudication.

10. ZONING — ORDINANCES — APPEAL AND ERROR — ADMINISTRATIVE LAW.

The administrative approach to zoning review would undoubtedly

destroy both the necessity and desirability of representative legislative action as well as reduce determinations on land use to a "what's-in-it-for-me" or spot zoning scheme generally eschewed as not being in the public interest.

11. ZONING — ORDINANCES — REASONABLENESS.

A judicial determination that a single-family zoning ordinance as applied to a plaintiff's parcel is unconstitutional should not mean that the plaintiff is necessarily entitled to use the property for multiple-family residences as proposed; the surrounding owners have an interest in how the property is developed, as does the defendant city in providing for the orderly development of land, consistent with its master plan.

12. ZONING — ORDINANCES — REASONABLENESS — EQUITY — REMEDIES.

If a zoning ordinance is declared to be invalid as applied to a plaintiff's property, the appropriate procedure is to enjoin the enforcement of the unconstitutional classification but to remand the matter to the appropriate municipal zoning authority to present, for the chancellor's consideration within 60 days of the order of unconstitutionality, an adopted amendatory ordinance comporting with the dictates of equity as well as the requirements of constitutional reasonableness as applied to the aggrieved landowner's parcel.

13. ZONING — ORDINANCES — CONSTITUTIONAL LAW.

A decision of the Court of Appeals that a zoning ordinance is constitutional is affirmed where the plaintiff has failed to meet its burden to affirmatively prove that either the defendant city's ordinance is arbitrary and unreasonable or that no governmental interest is advanced by the present zoning classification, and the plaintiff has not established a case for either a denial of substantive due process or a denial of equal protection.

OPINION BY LEVIN, J.

See headnotes 2, 4, 6 and 11.

14. ZONING — ORDINANCES — ADMINISTRATIVE LAW — APPEAL AND ERROR.

*The issue whether a local legislative body is acting in an administrative capacity and must observe procedures appropriate to individualized decision-making when considering a zoning change on individualized grounds can be duly presented and*

*decided only in a case where an individualized change in zoning, granted or denied, is challenged* on direct appeal *on the ground that it was not supported by competent, material, and substantial evidence on the whole record (Const 1963, art 6, § 28).*

15. Zoning — Ordinances — Administrative Law — Courts.

*The question how best to accommodate the interests of the landowner, the neighboring owners, and the city in a zoning dispute should be decided by the local zoning authority and not by a court, although it should be subject to judicial review; while many communities do not have experience in conducting administrative hearings in zoning matters, recent amendments to the zoning enabling acts now require most communities to develop a hearing capacity (1978 PA 637, 1978 PA 638, 1978 PA 640).*

16. Zoning — Ordinances — Reasonableness.

*The standard for decision in a rezoning dispute between a landowner's proposed use and the city's alternative uses should be the same as that applied in deciding whether the existing zoning is valid, reasonableness as applied to the property; hence, if there is more than one feasible use, the city's choice, unless unreasonable as applied, should govern.*

17. Zoning — Ordinances — Reasonableness — Courts.

*The judicial role after a declaratory judgment that a zoning ordinance is unconstitutional as applied should be limited to a determination whether the record shows that the city has provided the landowner with a feasible alternative use that is not unreasonable as applied, and the city's decision in that regard, if adequately supported by the record, should govern.*

18. Appeal and Error — Findings of Fact — Equity.

*The standard for reviewing actions tried upon the facts without a jury, even in equity cases, is no longer described as* "de novo"; *the standard in the court rules is the* "clearly erroneous" *standard, by which a finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed (GCR 1963, 11; GCR 1963, 517).*

19. APPEAL AND ERROR — FINDINGS OF FACT — CLEARLY ERRONEOUS.

   *The "clearly erroneous" standard relates to appellate review of a judge's findings of fact; it is not a substantive legal standard against which the facts so found are to be judged, nor does it change the scope or nature of the judicial function or of judicial review (GCR 1963, 517).*

20. ZONING — ORDINANCES — CONSTITUTIONAL LAW.

   *The Federal constitutional proscription against "taking" without compensation may include governmental action that diminishes the value of property even if there is no physical appropriation; while the use of land may be regulated by legislative bodies to a certain extent, if regulation goes too far it will be recognized as a taking (US Const, Am V).*

21. ZONING — ORDINANCES — CONSTITUTIONAL LAW.

   *An owner of land is not entitled to a maximum return on his investment or to the "highest and best use" of his land; nevertheless, the use imposed by a zoning ordinance must be a feasible use, and a zoning ordinance that prevents a property owner from making any beneficial use of his property is both unreasonable and confiscatory.*

22. ZONING — ORDINANCES — REASONABLENESS.

   *Whether in hindsight an owner of land should have developed his parcel earlier when he had the opportunity to do so, and even if he purchased the parcel knowing that as zoned it could not be used, a court may determine that the zoning ordinance when challenged by the landowner is unreasonable and confiscatory where the proofs show that the zoning ordinance precludes any feasible present use of the property.*

23. ZONING — ORDINANCES — ADMINISTRATIVE LAW.

   *The procedures of a local legislative body in zoning should be consonant with the nature of the function: where the function is adjudicative, concerning peculiarly the rights or property of a particular individual, the procedure should be such that the decision is based on pertinent evidence, to which interested parties have an opportunity to respond, and it should be supported by an explanation of the reasons for decision.*

24. ZONING — ORDINANCES — APPEAL AND ERROR — COURTS.

   *The scope of judicial review of a zoning decision by a local legislative body should be confined to determining whether 1) the decision of the local legislative zoning body conforms to the substantive standard for passing on exceptions or zoning*

changes articulated and applied by the local legislative body; 2) the decision of the local legislative zoning body is supported by competent, material and substantial evidence; 3) the procedures followed adequately protect the rights of those concerned; 4) the decision was consistent with constitutional requirements of substantive due process and equal protection and with any master plan.

25. Zoning — Ordinances — Constitutional Law — Reasonableness.

Zoning is not unreasonable or unconstitutional simply because it does not permit a use for which the land is suited.

26. Zoning — Ordinances — Police Power.

Local units of government may, pursuant to the police power granted by the Legislature, regulate land use; however, they may not preclude all growth nor may they entirely exclude a particular kind of residential development.

27. Zoning — Ordinances — Police Power — Reasonableness.

Zoning and other land-use regulations may properly be designed to facilitate planned growth and development, to protect the public health and safety, to permit governmental services to keep pace with development and to retain some of the aesthetic and environmental values which might otherwise be lost.

28. Zoning — Ordinances — Reasonableness — Mobile-Home Parks.

Absent any showing that there is a pattern of refusals of applications for rezoning to permit development of mobile-home parks, or any indication that the planning commission or city commission does not consider each application on its merits and acts in accordance with an unspoken plan to deny such applications, a zoning ordinance is not exclusionary, and the failure to permit a parcel to be used for mobile homes, although well suited for that purpose, does not justify a conclusion that the ordinance as applied to that parcel is unconstitutional.

*Varnum, Riddering, Wierengo & Christenson* (by *Jon F. DeWitt* and *Jeffrey L. Schad)* for plaintiff Zaagman.

*Bodman, Longley, Bogle, Armstrong & Dahling* (by *Michael B. Lewiston)* for plaintiffs Turkish.

*Rhoades, McKee & Boer* for defendant City of Kentwood.

*W. Thomas Marrocco, Jr.,* City Attorney, and *John J. Murray,* Chief Assistant City Attorney, for defendant City of Warren.

Amici Curiae:

*Bauckham, Reed, Lang & Schaefer* for Michigan Townships Association.

*Clan Crawford, Jr.,* and *Louis C. Andrews, Jr.,* for Michigan Municipal League; *Sherwin M. Birnkrant,* Director of Law, City of Pontiac; *Adele P. Laporte,* Assistant City Attorney, City of Ann Arbor; *Harris, Lax, Goldman & Gregg;* and *Robert Reese,* Corporation Counsel, City of Romulus, for State Bar of Michigan in support of existing legislative rezoning practice.

*Avern Cohn, William B. Dunn,* and *Norman Hyman* for State Bar of Michigan in support of the concurring opinion in *Kropf v Sterling Heights,* 391 Mich 139 (1974).

WILLIAMS, J. *(for affirmance).*

## Turkish v City of Warren

This zoning case causes us to revisit *Kropf,*[1] *Sabo,*[2] and *Kirk.*[3] We hold that the majority rule enunciated in both *Kropf* and *Kirk* as well as the minority opinion of Justice WILLIAMS in *Sabo* remain the law in Michigan today insofar as the appropriate standard for determining the validity

---

[1] *Kropf v Sterling Heights,* 391 Mich 139; 215 NW2d 179 (1974).

[2] *Sabo v Monroe Twp,* 394 Mich 531; 232 NW2d 584 (1975).

[3] *Kirk v Tyrone Twp,* 398 Mich 429; 247 NW2d 848 (1976).

of zoning ordinances is concerned. Accordingly, we affirm the Court of Appeals ruling of unconstitutionality, but remand this matter to the Warren City Council acting as zoning authority for further action consistent with this opinion.

## I. THE APPROPRIATE STANDARD

The appropriate standard for determining the constitutional validity of municipal zoning determinations was succinctly set forth in *Kirk* as follows:

"The principles and tests to use to determine whether the present zoning of plaintiffs' property is valid was detailed in *Kropf.*

"The important principles require that for an ordinance to be successfully challenged plaintiffs prove:

" '[F]irst, that there is no reasonable governmental interest being advanced by the present zoning classification itself * * * or

" '[S]econdly, that an ordinance may be unreasonable because of the purely arbitrary, capricious and unfounded exclusion of other types of legitimate land use from the area in question.' 391 Mich 139, 158.

"The four rules for applying these principles were also outlined in *Kropf.* They are:

"1. '[T]he ordinance comes to us clothed with every presumption of validity.' 391 Mich 139, 162, quoting from *Brae Burn, Inc v Bloomfield Hills,* 350 Mich 425; 86 NW2d 166 (1957).

"2. '[I]t is the burden of the party attacking to prove affirmatively that the ordinance is an arbitrary and unreasonable restriction upon the owner's use of his property * * *. It must appear that the clause attacked is an arbitrary fiat, a whimsical *ipse dixit,* and that there is no room for a legitimate difference of opinion concerning its reasonableness.' 391 Mich 139, 162, quoting *Brae Burn, Inc.*

"3. 'Michigan has adopted the view that to sustain an attack on a zoning ordinance, an aggrieved property

owner must show that if the ordinance is enforced the consequent restrictions on his property preclude its use for any purposes to which it is reasonably adapted.' 391 Mich 139, 162-163.

"4. This Court, however, is inclined to give considerable weight to the findings of the trial judge in equity cases.' 391 Mich 139, 163, quoting *Christine Building Co v City of Troy,* 367 Mich 508, 518; 116 NW2d 816 (1962)." 398 Mich 429, 439-440.

See *Sabo v Monroe Twp,* 394 Mich 531, 542; 232 NW2d 584 (1975). (Separate opinion of WILLIAMS, J., for reversal of the trial court.)

## II. FACTS

This is an unusual zoning case involving what the defendant's Director of Planning has described as "a problem piece" of property. Plaintiffs allege that, because of two factors, the cost of developing their property under the challenged R-1-C single-family zoning ordinance would equal plaintiffs' potential sales return, thereby rendering the disputed zoning designation unconstitutionally confiscatory as applied to their parcel. Throughout both their pleadings and proofs, plaintiffs have urged that their parcel be judicially reclassified to permit the construction of multiple family dwellings,[4] an R-3 use.[5]

---

[4] Plaintiffs' complaint, in pertinent part, reads as follows:

"(b) That plaintiffs be permitted to commence construction in accordance with defendant's R-3 zoning ordinance.

"(c) That plaintiffs have such further and other relief as may be just and equitable under the circumstances."

At no point in either their pleadings or testimony at trial have plaintiffs requested the judicial declaration of a proposed use other than the construction and development of multiple-family dwellings, one of many enumerated R-3 uses.

In its answer to plaintiffs' complaint, defendant merely prays that the complaint be dismissed and that costs as well as attorneys' fees be awarded. Defendant has consistently averred that the parcel in question is solely amenable to an R-1-C single-family residential use; defendant nowhere indicates that an R-3 use other than that requested by plaintiffs would be satisfactory.

[5] Warren Zoning Ordinance 30, art X, §§ 10.01 *et seq.,* delineates the particular uses and specifications to which property zoned R-3 may be put. Section 10.01 entitled "Uses Permitted" provides as follows:

"In all R-3 districts no building or land, except as otherwise provided in this ordinance, shall be erected or used except for one or more of the following specified uses:

"(a) All uses permitted and as regulated in R-2 districts.

"(b) Multiple-family dwellings and efficiency apartments.

"(c) Boarding, rooming and lodging houses or tourist homes.

"(d) Private garages or community garages, either separated or in connected groups, having common and unpierced dividing walls between contiguous private garages. Maximum area per car to be stored in such garages shall not exceed two hundred-fifty (250) square feet."

Warren Zoning Ordinance 30, art IX, §§ 9.01 *et seq.,* details the uses and specifications permitted under the R-2 two-family residential district classification referred to in § 10.01, *supra.* Section 9.01 provides as follows:

"In all R-2 residential districts, no building or land, except as otherwise provided in this ordinance, shall be erected or used except for one or more of the following specified uses:

"(a) All uses permitted and as regulated in R-1-C districts.

"(b) Two-family dwellings.

"(c) Private museums, on approval of the Planning Commission.

"(d) Building and uses customarily incidental to the above permitted uses shall include not more than one (1) private garage which shall provide parking space for not more than two (2) motor vehicles per living unit, not more than one of which may be a commercial vehicle which shall not exceed three-quarter (3/4) ton capacity and shall be kept housed within a garage when not in use, provided said commercial vehicle is owned and operated by a member of the family who resides in said living unit. Maximum area per car to be stored in such garages shall not exceed two hundred fifty (250) square feet.

"(e) A residence may be used for a home occupation, provided it complies with § 2.29 of this ordinance, after approval has been granted by the Board of Appeals.

"(f) Hospitals, except animal hospitals and hospitals or sanitariums for contagious, mental or drug or liquor addict cases, and institutions of a philanthropic and charitable nature, after approval has been granted by the Planning Commission.

"(g) The storage or parking of trucks, truck tractors and truck trailers of over three-quarter (3/4) ton capacity, automobile trailers or the storage, parking or use of coaches, bus or streetcar bodies, or similar dwellings, tourist cabins, or tents shall not be allowed or considered a legal accessory use in an R-2 district. This shall not prohibit the storage of one unoccupied house trailer or watercraft, which is the property of the occupant, provided, however, that such house trailer or watercraft shall be parked in the rear yard at least ten (10) feet away from any dwelling and any property line."

Warren Zoning Ordinance 30, art VII, §§ 7.01 *et seq.,* captioned "R-

1-C One Family Residential District" provides in § 7.01 for all uses permitted under the R-1-B designation, Warren Zoning Ordinance 30, art VI, §§ 6.01 *et seq.,* which in turn refers to all uses permitted under R-1-A. Warren Zoning Ordinance 30, art V, §§ 5.01 *et seq.,* details the uses permitted under the R-1-A one-family residential district classification. Those uses are defined in § 5.01 as follows:

"In all R-1-A districts, no building or land, except as otherwise provided in this ordinance, shall be erected or used except for one or more of the following specified uses:

"(a) One-family dwellings.

"(b) Farms on those parcels of land separately owned outside the boundaries of proprietary or supervisor's plats, having an area of not less than three (3) acres, all subject to city and county health and sanitation ordinances.

"(c) Churches, public schools, public libraries, private educational institutions, when approved by the City of Warren Planning Commission.

"(d) Municipal owned and operated parks and playgrounds, available for use by the residents of the City of Warren, after approval by the Planning Commission.

"(e) Church or public building bulletin boards, not exceeding ten (10) square feet in area, and temporary signs not exceeding six (6) square feet in area appertaining to the lease, hire or sale of a building or premises, which sign shall be removed as soon as the premises are leased, hired or sold. Provided, further, that not more than one (1) temporary non-illuminated subdivision sign pertaining to the sale or rental of premises being developed on which it is maintained, and having an area of not more than three hundred (300) square feet nor more than ten (10) square feet for each lot within the subdivision of less than thirty (30) lots. Said sign shall not exceed twelve (12) feet in height above ground and shall be removed upon completion and occupation of buildings.

"(f) Community buildings, country clubs, fraternal lodges, or similar civic or social clubs (but not a residential club, or a club operated as a commercial enterprise), after approval by the Planning Commission.

"(g) The use of open land for privately owned and operated parks, picnic groves, golf courses, or similar facilities for outdoor exercises and recreation, which may or may not be operated for profit, provided such use does not impair the natural appearances of such land or tend to produce noise or annoyance to surrounding properties, shall be permitted only after approval by the Planning Commission.

"(h) Publicly owned buildings, transformer stations and substations, without service yards, after the approval of the City of Warren Planning Commission as being in harmony with the structures in the area, not injurious to the surrounding neighborhood and in accord with the spirit and purpose of this ordinance.

"(i) Temporary buildings for uses incidental to construction work, which buildings shall be removed upon completion or abandonment of the construction work.

"(j) The use of a parcel, lot or lots for the carrying on of gardening activities or the production of agricultural products through the

The first of two factors identified by plaintiffs in support of their position concerns the allegation that, despite plaintiffs' efforts to persuade the city to develop the abutting area with a uniform road system, defendant has consistently permitted the platting of surrounding land in such a manner as to render plaintiffs' property landlocked and road-less. The second factor put forward by plaintiffs concerns the further allegation that, due to the extreme narrowness of plaintiffs' parcel, in order to develop their land in accordance with the disputed R-1-C zoning scheme plaintiffs would have to

direct tilling of the soil, together with facilities for the sale of the products thus produced thereon shall be permitted, provided that said facilities for the sale of any such products shall be located on the premises not nearer than thirty (30) feet from the front lot line.

"(k) Accessory buildings or uses customarily incident to any of the above permitted uses, when located on the same or adjoining lot and not involving any business, profession, trade or occupation. One (1) private garage for each residential lot in which there is housed not more than three (3) vehicles, not more than one (1) of which may be a commercial vehicle, shall be considered a legal accessory use, provided, however, any such commercial vehicle shall not exceed three-quarter (3/4) ton capacity, and shall be kept housed within a garage when not in use; and provided, further, that no moving vans shall be housed in private garages. All garages and/or accessory buildings shall contain not more than seven hundred (700) square feet of floor area.

"(l) The storage or parking or use of moving vans, automobile trailers, trailer coaches, bus or streetcar bodies, or similar dwellings, tourist cabins or tents, shall not be allowed or considered a legal accessory use in an R-1-A district, except that a temporary permit may be issued for the parking in the rear yard of one (1) house trailer, for not more than thirty (30) days within any calendar year, when occupants of such house trailer are provided with the sanitary facilities used by the household on whose lot they are occupying and only when such trailer occupants are visiting relatives and non-paying guests. This shall not prohibit the storage of one (1) unoccupied house trailer or small utility trailer, or a single watercraft in the rear yard no larger than one which may be transported with trailer by a passenger motor vehicle, and which is the property of the occupant on said lot, provided such trailer or watercraft is parked at least ten (10) feet from any dwelling or property line."

It is apparent from this zoning scheme that a plethora of uses are permitted under the R-3 zoning designation, including but not limited to the specific multiple-family dwelling use proposed by plaintiffs herein.

construct a road servicing only one rather than two rows of homes. Under this circumstance, homes constructed on plaintiffs' property would necessarily face the backs of already existing residences, an obviously undesirable arrangement.

The trial court held that in view of these circumstances the city's zoning designation was "unreasonable, arbitrary and confiscatory" and therefore constitutionally invalid. That court specifically declined to consider the case as coming "within the purview of a preferred use doctrine", *Bristow v Woodhaven,* 35 Mich App 205; 192 NW2d 322 (1971), and relied on this Court's ruling in *Bassey v Huntington Woods,* 344 Mich 701, 704-705; 74 NW2d 897 (1956), that: "[A]n ordinance that prevents the property owner from making any beneficial use of his property is both unreasonable and confiscatory". In its order of judgment the trial court granted the definitive relief sought in plaintiffs' complaint, stating:

"2. Defendant City of Warren, its agents, officers, employees, attorneys and all persons acting in concert with it, are hereby enjoined from interfering with plaintiffs' use of the property in accordance with defendant's R-3 zoning classification."

The Court of Appeals affirmed the trial judge's finding of confiscation as supportable by the record, citing *Smith v Wood Creek Farms,* 371 Mich 127; 123 NW2d 210 (1963). That Court, however, simultaneously offered the following gratuitous remark:

"We would prefer to reverse without prejudice to an application to the legislative body of defendant seeking an administrative hearing with regard to the reasonableness of plaintiffs' proposed [R-3, multiple-family

dwelling] use." 61 Mich App 435, 440; 232 NW2d 732
(1975).

### III. Application of the Appropriate
### Standard on *De Novo* Review to the Facts

Applying those rules enumerated in Part I dis-
cussing *Kirk, supra,* it is clear that this matter is
particularly governed by rule 3 of *Kropf, i.e.,* "to
sustain an attack on a zoning ordinance, an ag-
grieved property owner must show that if the
ordinance is enforced the consequent restrictions
on his property preclude its use for any purposes
to which it is reasonably adapted". It is, of course,
plaintiffs' duty "to prove affirmatively that the
ordinance is an arbitrary and unreasonable re-
striction upon the owner's use of his property"
*(Kropf,* rule 2), as the "ordinance comes to us
clothed with every presumption. of validity"
*(Kropf,* rule 1).

Applying these three rules to the totality of
circumstances adduced at trial, our review of the
record supports the finding that defendant's plat-
ting of surrounding land has landlocked plaintiffs'
parcel to the extent that all reasonable uses are
precluded under the R-1-C zoning designation;
plaintiffs have affirmatively proven that their de-
velopment costs under the disputed R-1-C ordi-
nance would be roughly equivalent to any poten-
tial sales returns on the developed property,
thereby rendering the classification scheme unrea-
sonable and void. Therefore, reviewing the record
*de novo,* yet affording "considerable weight to the
findings of the trial judge in equity" *(Kropf,* rule
4), we uphold the rulings of unconstitutionality
made by both the trial court and Court of Appeals.
As applied to plaintiffs' property, defendant's R-1-C
zoning classification is adjudged "unreasonable,

arbitrary and confiscatory", thereby rendering the disputed R-1-C zoning designation constitutionally invalid and void.

## IV. EFFECT OF CONSTITUTIONAL INVALIDITY

Having found defendant's R-1-C single family zoning ordinance void, the following issues require our attention: (1) what effect is to be accorded our *de novo* finding of unconstitutionality?; and (2) through what procedure is this effect to be determined?

More specifically, the first question to be resolved is whether, considering both plaintiffs' asserted interest in constructing multiple-family dwellings on their parcel—a permitted R-3 use— and the trial court's order generally enjoining defendant "from interfering with plaintiffs' use of the property in accordance with defendant's R-3 zoning classification", plaintiffs may construct any structure deemed permissible within the R-3 classification or only that specific use prescribed at trial. For example, may plaintiffs construct: multiple-family units (as indicated in their pleadings); garden apartments; a two-and-one-half story apartment house; a storage building; a church, etc.? The second question requiring resolution is whether this determination is to be made by the trial court alone, an appropriate administrative entity as has been suggested by Justice LEVIN, the trial court supplemented by public testimony, or this Court alone?

In resolving these questions, after careful consideration we reject the approach suggested by both Justice LEVIN and the Court of Appeals below urging remand exclusively to an appropriate administrative body for a full trial-type administrative, quasi-judicial determination of the use to be

made by an aggrieved landowner subsequent to a judicial declaration of unconstitutionality. In contrast, we rule that subsequent to a judicial declaration of invalidity the matter should be remanded to the appropriate municipal zoning authority to present, for the chancellor's consideration within 60 days of this Court's or the appropriate reviewing court's order of unconstitutionality, an adopted amendatory ordinance comporting with the dictates of equity as well as the requirements of constitutional reasonableness as applied to plaintiffs' parcel; upon the presentation of such amendatory ordinance, the chancellor shall proceed as detailed *infra,* Part V.

## A. The Administrative or Quasi-Judicial Approach

While in the instant case a unanimous Court of Appeals felt "bound by existing precedent", 61 Mich App 435, 438, to uphold the chancellor's finding of invalidity and order of general injunctive relief, that Court expatiated on Justice LEV-IN's administrative approach to the review of zoning determinations set forth in *Kropf, supra,* 164 *et seq.* In *obiter dictum,* the Court of Appeals remarked:

"We would prefer to reverse without prejudice to an application to the legislative body of defendant seeking an administrative hearing with regard to the reasonableness of plaintiffs' proposed use." 61 Mich App 435, 440.

We note that the position urged by the Court of Appeals in the instant case has twice been rejected by a majority of this Court: in *Kirk, supra,* and *Kropf, supra.*

Although similar, Justice LEVIN's opinion in this

case adopts a somewhat modified version of the administrative approach urged by the Court of Appeals. Accordingly, having found defendant's R-1-C ordinance unconstitutionally confiscatory, Justice LEVIN is not disposed to affirm the trial court's order permitting construction "in accordance with defendant's R-3 zoning classification". Rather, the Justice would direct that the matter be remanded exclusively to the appropriate administrative body to conduct a full trial-type administrative hearing and to render a decision supported by substantial evidence on the record developed at that hearing; such decisional authority, absent subsequent appeal, is wholly ceded to the administrative body without the necessity of the chancellor's review and approval.

Contrary to the dictates of the traditional legislative approach, the LEVIN opinion offers plaintiffs the option of either (1) first seeking a court ruling on unconstitutionality followed by remand for an administrative hearing and determination unaided by impartial judicial scrutiny and equitable consideration with respect to a plaintiff's proposed use, or (2) first challenging a zoning classification in an administrative proceeding—whether the subject ordinance has been judicially determined constitutional or not—in the hope that such body will in effect grant a variance. In either case, the opinion continues, the administrative hearing is subject to judicial review, albeit not *de novo* as is presently the established law in this state.

We disagree with both options. The first option impermissibly invades this Court's powers of *de novo* review and places a successful litigant in the precarious position of seeking to establish its proposed use before an adversely interested litigant (in this case the city) without the benefit of subse-

quent judicial consideration unless an appeal is effected on the ground that such decision is not supported by substantial evidence on the record. The second option impermissibly encroaches upon the presumption of legislative validity as well as time-honored notions of separation of powers.

My Brother LEVIN firmly believes that such a system of administrative *ad hoc* zoning ordinance amendment procedures will promote the public welfare as well as relieve the burden on the courts. His opinion indicates that he is not alone in that laudable belief.

We are of the opinion, however, that such a system as proposed by Justice LEVIN which permits every constitutionally valid zoning ordinance to be challenged by an affected property owner can only invite countless challenges, many of which must proceed to the courts for a dispositive adjudication. The net result of such a quasi-judicial scheme would most assuredly increase rather than relieve the burden on the courts; the burden on zoning bodies would likewise be unquestionably magnified.

Further, and perhaps more significant, the authority of a zoning body's legislative action would likely be debased concomitantly to the extent that every affected property owner could challenge that authority, not on the basis of the value of the constitutionally valid zoning classification to the general public, but on the basis of that zoning determination's value to the individual property owner regardless of the general welfare. Such consequence would undoubtedly destroy both the necessity and desirability of representative legislative action as well as reduce land use determination to a type of "what's-in-it-for-me" or spot zoning scheme generally eschewed as not in the public interest.

For the above reasons, we reject both options of Justice LEVIN's administrative approach to the review and challenge of zoning determinations. At the same time, however, we find certain components of that approach instructive insofar as they could be applied on remand to defendant city council aided by the chancellor to determine the reasonableness of a landowner's proposed use in accordance with the dictates of equity. We generally accept the following statement of Justice LEVIN in Part IV D of his opinion as apposite in this regard:

"The judicial determination that the ordinance as applied to the Turkish parcel is unconstitutional should not mean that the Turkishes are necessarily entitled to use the property for multiple-family residences. The surrounding owners have an interest in how the Turkish property is developed, as does the city in providing for orderly development, consistent with its master plan, with adequate services and protection of aesthetic and environmental values. Accordingly, although the Turkishes' proposed use may appear to a court to be 'reasonable', there may be other feasible means of developing single-family homes on the parcel if the city permits variances regarding street width and lot size or under other circumstances. The parcel might also be used, consistent with the present zoning, for schools, religious institutions, or some other use. Although uses consistent with present zoning may not be feasible, it may be that some use other than multiple residences is feasible and more compatible with competing interests."

## B. The Legislative Approach

While we are not persuaded to adopt Justice LEVIN's administrative approach to the review of zoning determinations, questions remain regarding the effect to be accorded an ordinance's judicially declared invalidity as well as the appropriate judi-

cial procedure to be undertaken in determining and ordering such effect.

In resolving these questions, the line of cases discussed *infra* provides this Court with five alternative methods of judicial action subsequent to a judicial finding of constitutional invalidity:

(1) leave the subject parcel unzoned until either a use is instituted by plaintiff or the parcel is rezoned, *Daraban v Redford Twp,* 383 Mich 497; 176 NW2d 598 (1970) (dissenting opinion);

(2) enjoin defendant from enforcing a zoning classification other than that classification urged by plaintiff and determined appropriate by the court, *Long v Highland Park,* 329 Mich 146; 45 NW2d 10 (1950) and its progeny, *infra;*

(3) enjoin defendant from such interference and affirmatively order the institution of plaintiff's proposed specific use on the parcel, *Daraban* (majority), *infra;*

(4) enjoin defendant from enforcing the unconstitutional classification but remand the matter to the appropriate municipal zoning authority to present for the chancellor's consideration within 60 days of this Court's or the appropriate reviewing court's order of unconstitutionality, an adopted amendatory ordinance comporting with the dictates of equity as well as the requirements of constitutional reasonableness as applied to an aggrieved landowner's parcel, see *Dequindre Development Co v Warren Charter Twp,* 359 Mich 634; 103 NW2d 600 (1960) (separate opinion of Justice BLACK), *infra;* or,

(5) remand, per the LEVIN opinion, exclusively for an administrative hearing to determine an appropriate use of plaintiff's parcel, discussed *supra.*

We find alternative (1) unacceptable for the

reason that merely rendering the parcel unzoned leaves it potentially vulnerable to any uses including those neither urged by plaintiff nor compatible with the orderly development of the community. Alternative (2) may be too expansive in scope insofar as it permits a landowner to develop its property within the general zoning classification approved by the court whether or not such use would be equitable. Alternative (3) is unacceptable for the reason that it may be too restrictive in its implicit rejection of other uses to which plaintiffs' land might more equitably be put. Finally, Justice LEVIN's recommended position, (5), is not adopted for reasons heretofore discussed.

We adopt alternative (4) and hold that, subsequent to a judicial finding of zoning classification invalidity, enforcement of the disputed ordinance should be enjoined and the matter remanded to defendant city council to present, for the chancellor's consideration within 60 days of this Court's or the appropriate reviewing court's order of unconstitutionality, an adopted amendatory ordinance comporting with the dictates of equity as well as the requirements of constitutional reasonableness as applied to an aggrieved landowner's parcel.

Specifically, upon the expiration of or within this 60-day period, the chancellor shall enter one of the following orders:

(i) If, after remand to defendant city council, plaintiff and defendant find defendant's submitted amendatory ordinance mutually acceptable, the chancellor shall order the implementation of such "midsatisfactory" amendatory ordinance.

(ii) If, after remand to defendant city council, defendant submits an amendatory ordinance unacceptable to plaintiff but embodying Justice BLACK's "midsatisfactory use" as determined by the chan-

cellor through a balancing of equitable considerations, the chancellor shall order the implementation of such "midsatisfactory" amendatory ordinance.

(iii) If, after remand to defendant city council, defendant submits an amendatory ordinance unacceptable to plaintiff and plaintiff submits a proposed use embodying Justice BLACK's "midsatisfactory use" as determined by the chancellor through a balancing of equitable considerations, the chancellor shall order the implementation of plaintiff's proposed "midsatisfactory use".

(iv) If, after remand to defendant city council, neither plaintiff nor defendant can agree upon the other's amendatory ordinance or proposed use and the chancellor determines that neither party's proposal embodies Justice BLACK's "midsatisfactory use", the chancellor shall order the implementation of a "midsatisfactory use" after both plaintiff and defendant as well as other affected parties have had the benefit of a hearing and the submission of proofs to determine the most equitable or "midsatisfactory use" to be made of plaintiff's parcel.

(v) If, after remand to defendant city council, defendant does not submit an adopted amendatory ordinance to the chancellor for consideration within 60 days of this Court's or the appropriate reviewing court's order of unconstitutionality, we direct the chancellor to conduct a hearing supplemented by the submission of proofs by all affected parties to determine and implement the most equitable or "midsatisfactory use" to be made of plaintiff's parcel.

Of course, if either party is dissatisfied with the chancellor's order, an appeal is permitted from that order under normal procedures of *de novo* review.

This ruling is to be accorded limited retroactive effect as to all actions hereinafter commenced as well as all actions heretofore commenced and now pending in either the trial or appellate courts.

The alternatives set forth above are discussed below.

*Alternative 1: Declaration of Invalidity Under Both the* Brae Burn *Rule as Well as the* Daraban *Dissent Rendering the Parcel Unzoned*

The dissenting opinion in *Daraban v Redford Twp,* 383 Mich 497, 501; 176 NW2d 598 (1970), argued that this Court was without the requisite constitutional power to affirmatively do more than declare a disputed land use classification invalid. The trial court having declared the *Daraban* zoning restriction void, the dissent reasoned, this Court was incompetent either: (i) to enjoin a defendant municipality from zoning the subject parcel in a manner different from that sought by plaintiff; or, (ii) to order the institution of plaintiff's proposed use as either prayed in plaintiff's complaint or argued before the lower judicial tribunal as to that now unzoned parcel.

In effect, the dissent in *Daraban* would have rendered the subject parcel unzoned, an interim determination awaiting either a legislative rezoning or the institution of some use of the parcel by the previously aggrieved landowner. Although a technically logical position, we are of the opinion that restricting the Court's declaratory powers in such an absolute manner may operate to produce a result neither generally prayed nor argued for by an aggrieved landowner and potentially incompatible with the orderly development of the general community or abutting parcels of property.[6]

---

[6] See 4 Anderson, American Law of Zoning (2d ed), § 28.10, p 378. Other courts have similarly found that leaving property unzoned is

We therefore reject this alternative form of judicial action rendering the property unzoned as impractical and inequitable.

*Alternative 2: Issuance of General Injunctive Relief*

Sensitive to the potential dangers posed by leaving land unzoned, the judiciary of this state has, at minimum, uniformly granted aggrieved landowners injunctive relief generally restraining a defendant municipality from rezoning the subject parcel in a manner different from that classification sought by plaintiff.

Three cases decided by this Court are particularly illustrative of this proposition. In each of these cases, this Court sustained the chancellor's decree to the extent that the decree: (i) found the disputed classification unconstitutional; (ii) enjoined defendant from enforcing the invalid restriction; (iii) permitted plaintiff to proceed under the classification urged by plaintiff; but, (iv) did not consider or order the propriety of the aggrieved landowner's proposed specific use.

In *Long v Highland Park,* 329 Mich 146; 45 NW2d 10 (1950), plaintiffs sought to institute an

unacceptable. The Illinois Court of Appeals in *Harshman v De Kalb,* 64 Ill App 2d 347, 352-353; 212 NE2d 146 (1965), stated the following in this regard:

"The practical effect of declaring an existing zoning ordinance null and void in regard to a particular piece of property is to leave that piece of property in a condition which, for lack of a better description, has been called unzoned. To avoid the obvious dilemma of such a situation, recent cases have held that the court may frame its order in reference to a specific proposal before it and find that the contemplated use would be a reasonable one. *Sinclair Pipe Line v Village of Richton Park,* 19 Ill 2d 370; 167 NE2d 406 [1960]; *Franklin v Village of Franklin Park,* 19 Ill 2d 381; 167 NE2d 195 [1960].

"The aim of these decisions is to avoid the possibility of a re-zoning of the property to some other undesirable classification and, thus, invite further litigation, and to prevent any exploitation by the owner of the fact that his property is, at least temporarily, unzoned. To those ends, the wisdom of these decisions seems clear."

unspecified business use within the general B-2 business classification on a tract of land designated R-1 and, therefore, zoned for nonbusiness uses. The trial court declared defendant's disputed R-1 zoning ordinance (nonbusiness purposes) invalid as applied to plaintiff's land and issued an injunction restraining defendant from attempting to enforce the restrictions. The trial court further ordered that plaintiffs be permitted to use the subject parcel "for any of the purposes allowed by the ordinance under classification B-2, for business purposes". This Court unanimously affirmed. Neither the trial court nor this Court, however, ordered or passed on the reasonableness of plaintiff's proposed particular use.

Second, in the case of *Industrial Land Co v Birmingham,* 346 Mich 667; 78 NW2d 656 (1956), a unanimous Supreme Court upheld a circuit court ruling of zoning classification unconstitutionality as well as the chancellor's order that "the use of this property for business purposes, as provided in section 1001 of ordinance No 221, as amended, is a reasonable use. * * * [P]laintiffs are also entitled to an injunction restraining the original defendants from prohibiting plaintiffs' use of the premises for those [business] uses permitted by section 1001 of the ordinance, and from interfering with such uses". 346 Mich 667, 672. Attacking the trial judge's injunctive order finding defendant's single-family zoning ordinance unconstitutional, defendant claimed that "the court cannot, by injunctive relief, proceed to rezone plaintiffs' property, as that is a legislative act and a function of the city commission of Birmingham, and that by doing so, would be zoning by judicial determination". 346 Mich 667, 671. This claim was summarily rejected by the Supreme Court on the basis of *Long, supra.*

As in *Long,* this Court did not specify the precise
use to which plaintiff could put its lands beyond
permitting those general uses allowed under the
zoning classification adjudged valid.[7]

Lastly, in *Roll v City of Troy,* 370 Mich 94; 120
NW2d 804 (1963), plaintiffs sought to develop their
parcel into 15,000-square-foot lots; that parcel was
zoned to permit lots no smaller than 30,000 square
feet in area. This Court upheld the chancellor's
order declaring defendant's 30,000-square-foot min-
imum lot size restriction unconstitutionally confis-
catory as applied to plaintiffs' property, restrain-
ing defendant from enforcing that restriction on
plaintiffs' land, and permitting plaintiffs to develop
their land in accordance with the general single-
family zoning classification. This Court, however,
vitiated the lower court's order to the extent that
the chancellor had authorized plaintiffs "to use the
said property for a residential subdivision in accor-
dance with the proposed plat attached to plaintiffs'
bill of complaint [establishing the minimum lot
size at 15,000 square feet]". 370 Mich 94, 96, 99.
Thus, while upholding the lower court's decree
that defendant could not constitutionally restrict
plaintiffs' residential lot size to the disputed num-
ber of minimum square feet, the Court affirmed its
earlier posture that the trial court could not affir-
matively sanction a specific proposed use. Said a
majority of six Justices:

---

[7] In *Daraban, supra,* Justice T. G. KAVANAGH in his dissenting
opinion noted the following cases in support of the *Long* proposition
which he unsuccessfully sought to overturn:

"The cases of *Long v Highland Park,* 329 Mich 146 [45 NW2d 10]
(1950); *Redford Moving & Storage Co v Detroit,* 336 Mich 702 [58
NW2d 812] (1953); *Industrial Land Co v Birmingham,* 346 Mich 667
[78 NW2d 656] (1956); *Dequindre Development Co v Warren Charter
Twp,* 359 Mich 634 [103 NW2d 600] (1960), have apparently come to
stand as authority for the issuance of injunctions which can restrain
municipalities from zoning the property involved in a manner differ-
ent from that sought by the plaintiff." 383 Mich 497, 506.

"This Court agreed with the trial judge in *Christine,* 515, 516, that he had no legal duty, right, or obligation to undertake to pass upon the reasonableness of proposed zoning that is not yet the subject of an ordinance. Recognizing that zoning is a legislative function we affirm the principle that courts cannot write zoning laws. The trial court's decree is modified by striking therefrom that portion authorizing and empowering plaintiffs to use the property as proposed in the plat. In all other respects the decree is affirmed." 370 Mich 94, 99.

The state of the law in 1963, therefore, appeared clearly settled that neither this Court nor the lower courts of this state could affirmatively order the institution of a specifically proposed use as reasonable subsequent to a finding of classification invalidity.[8] Rather, this Court felt itself constrained to merely enjoin defendant from imposing a zoning classification other than that generally decreed permissible by the lower tribunal.[9]

We are of the opinion that this alternative form of relief may be too expansive in scope insofar as it sanctions an aggrieved landowner's development of its parcel in *any* manner enumerated under the general zoning classification whether or not such potential uses would be inequitable or deleterious to the surrounding community or abutting landowners. Since overall equitable considerations are ignored, we reject this alternative.

*Alternative 3: Issuance of Injunctive Relief as Well as Order Affirmatively Sanctioning Plaintiff's Specifically Proposed Use: The* Daraban *Rule*

[8] See 4 Anderson, American Law of Zoning (2d ed), § 28.10, p 379, and cases cited therein.

[9] See *Dade County v Moore,* 266 So 2d 389 (Fla App, 1972); *Clearwater v College Properties, Inc,* 239 So 2d 515 (Fla App, 1970); *Hudson v Buena Vista Twp Zoning Board,* 6 Mich App 625; 150 NW2d 167 (1967).

In 1970, however, this Court expressly expanded the declaratory powers of the judiciary in reviewing zoning determinations beyond the options of either rendering the land unrestricted or merely enjoining the enforcement of a zoning classification as applied to a plaintiff's subject parcel different from that decreed by the court. Indeed, the majority in *Daraban, supra,* sanctioned an order not only enjoining defendant's interference with plaintiff's requested general use but also affirmatively permitting the specific use proposed by plaintiff.

In *Daraban* the trial judge decreed:

"It is further ordered and adjudged that the defendants, * * * be further permanently enjoined from interfering with plaintiff's erection of apartment dwellings on the property in question *in accordance with plaintiff's exhibit number 4,* referred to in the court's opinion on page 9, *and in accordance with the R-3 zoning classification* of the township of Redford." 383 Mich 497, 500. (Emphasis added.)

On appeal, 15 Mich App 132; 166 NW2d 295 (1968), defendant alleged that the chancellor's use-specific injunction constituted a judicial invasion of the legislative power. Judge PRATT, writing for Presiding Judge HOLBROOK and then-Judge, now-Justice LEVIN, affirmed the trial court's definitive decree of injunctive relief as supportable by 15 years of precedent.

On subsequent appeal this Court affirmed the trial court's order permitting the institution of plaintiff's proposed specific use.

It is clear from the majority's 1970 opinion in *Daraban* that a court may order that definitive relief requested by plaintiff in its pleadings or argued before the Court. Contrary to the position

urged by the *Daraban* dissent, a court may order
the institution of not only the general land use
classification urged by the landowner but also a
specific use prayed for.[10]

---

[10] Other jurisdictions have sanctioned orders permitting the institu-
tion of an aggrieved landowner's proposed specific use subsequent to a
finding of classification invalidity and supportable by evidence as to
reasonableness of that specific use. We find the following cases per-
suasive:

In *Fiore v Highland Park,* 76 Ill App 2d 62; 221 NE2d 323 (1966),
plaintiff sought to develop multiple-family dwellings on its parcel
zoned for office and research use; plaintiff presented specific proofs at
trial as to the nature of the apartment complex they intended to
construct on the subject parcel. The trial court declared the disputed
ordinance invalid and ordered defendant to permit plaintiff to develop
its parcel for multiple-family dwellings under the general zoning
classification permitting such use. On appeal, the Illinois Court up-
held the finding of unconstitutionality, but reversed the chancellor's
order as too broad insofar as it did not address itself to the reasona-
bleness of the "specific use contemplated by the owner". 76 Ill App 2d
62, 76. The Court offered the following guidelines for the chancellor to
consider on remand in framing its decree with respect to plaintiff's
proposed specific use alone:

"The most that a court may do after declaring an existing zoning
ordinance void as applied to certain property is to find that the
specific use contemplated by the owner is reasonable and may be
permitted.

"Under such circumstances, the court may frame its decree in the
light of the evidence before it with reference to the specific proposed
use; and may decree such contemplated use to be a reasonable one.
Such decree neither impinges upon the legislative function, nor in
effect leaves the property unzoned, with its potential problem of
further litigation due to further rezoning by the municipality; and it
limits plaintiffs' use of the land to that contemplated and indicated by
the record. *Sinclair Pipe Line v Richton Park, supra,* 379; 167 NE2d
406; *Harshman v De Kalb, supra.*

"In the case at bar, the plaintiffs presented evidence as to the
nature of the apartment complex they intended to construct on these
premises. The decree of the trial court should be framed with refer-
ence to the evidence of this intended use and permit such use only,
rather than any permitted under the applicable multiple-family zon-
ing restriction. If the court finds that such evidence is not sufficient to
enable it to intelligently frame its decree, it should hear additional
evidence pertinent to such use." 76 Ill App 2d 62, 76.

The Illinois Court of Appeals in *La Salle National Bank v Chicago,*
130 Ill App 2d 457; 264 NE2d 799 (1970), was faced with a situation
similar to that presented in *Fiore.* In *La Salle,* plaintiffs sought to
construct "three detached structures containing a total of twenty-two
units" on property zoned for single-family residential dwellings. The
trial court held the disputed classification invalid and entered an

order permitting plaintiffs to construct a "multiple-family apartment project subject * * * to the R-3 General Residence District provisions of the Chicago Zoning Ordinance". On appeal, the Court affirmed the chancellor's finding of unconstitutionality but reversed and remanded the lower court's order which directed the construction of multiple-family dwellings, a use different from that specifically proposed by plaintiffs (*i.e.*, three detached structures containing 22 units). On remand, the chancellor was restricted to a determination of the reasonableness of plaintiffs' specifically averred definitive relief. Said the opinion's author:

"The issue here is how a decree in a zoning case is to be framed. * * * Since the practical effect of declaring an existing zoning ordinance void in regard to a particular piece of property is to leave that piece of property in an unzoned condition, the court may frame its order in reference to a specific proposal before it and find that the contemplated use would be a reasonable one. *Harshman v De Kalb,* 64 Ill App 2d 347; 212 NE2d 146 (1965). *Sinclair Pipe Line v Village of Richton Park,* 19 Ill 2d 370; 167 NE2d 406 (1960). However, the court must exercise this authority with extreme care to avoid any encroachment into the legislative function of zoning. *Harshman v De Kalb, supra.* The most that a court may do after declaring an existing zoning ordinance void as applied to certain property is to find from clear evidence before it that the specific use contemplated by the owner is reasonable and may be permitted. *Fiore v Highland Park,* 76 Ill App 2d 62, 76; 221 NE2d 323 (1966). Consequently, the decree of the trial court should be framed with reference to the evidence of the intended use and permit such use only, rather than being framed with reference to a multiple family zoning classification. *Fiore v Highland Park, supra."* 130 Ill App 2d 457, 460-461.

*Dixon v Kane County,* 77 Ill App 2d 338; 222 NE2d 354 (1966), presented a separate panel of Illinois appellate justices with an aggrieved landowner's attempt to construct a gas service station (a B-1 business use) on property zoned for single-family residential and agricultural uses. That panel reversed the chancellor's order upholding the validity of the disputed classification and remanded the matter for entry of an order authorizing the use of plaintiff's parcel for gasoline service station purposes "since the plaintiff did present evidence concerning [that] proposed use of the property and since this appears to be a reasonable use * * * in accordance with the evidence". 77 Ill App 2d 338, 343. Again citing *Fiore, supra,* the Court stated the following general proposition:

"If no specific use is proposed, the most the court can do is invalidate the zoning. If a specific use is proposed, the court, after invalidating the zoning, may authorize the proposed use if that is reasonable under the circumstances of the case." *Id.,* 342.

Further, in *Harshman v De Kalb,* 64 Ill App 2d 347; 212 NE2d 146 (1965), the Illinois appellate panel upheld the chancellor's declaration of classification invalidity but reversed and remanded to develop a record, and finding thereon, as to a specific use to be made by plaintiff of its property, which specific intentions had not been averred at trial. Citing a statement of the Illinois Supreme Court in *Reeve v Village of Glenview,* 29 Ill 2d 611, 615-617; 195 NE2d 188, 191 (1963), the

Compared to alternatives (1) and (2), we find that this alternative may be too restrictive in scope. The *Daraban* approach is rejected for the reason that it expressly dismisses consideration of any other uses to which the parcel may equitably be put beyond that specific use urged by plaintiff.

*Alternative 4: The Position Urged by Justice* BLACK *in* Dequindre: *Balancing the Equities on Remand*

Midway between the positions espoused by the *Daraban* dissent, rendering the parcel unzoned, and the *Daraban* majority, ordering a particular use proposed by an aggrieved landowner, lies the "balancing of the competing equities" position promulgated by Justice BLACK in his separate opinion for affirmance on condition found in *Dequindre Development Co v Warren Charter Twp,* 359 Mich 634; 103 NW2d 600 (1960).

In *Dequindre,* plaintiff sought to construct a trailer coach park on a parcel of land zoned for single-family residential uses. The chancellor declared defendant's disputed ordinance confiscatory

*Harshman* Court forwarded the proposition that a court may not order relief in the absence of clear evidence of the reasonableness of a specific use contemplated by plaintiff. Once presented with a proposed specific use, therefore, the chancellor was empowered to determine its reasonableness and frame a decree accordingly. Regarding the requirement of reasonableness, the panel cautioned:

"It is also apparent that the courts must exercise this authority with extreme care to avoid any encroachment into the legislative function of zoning. It is imperative that there be clear evidence before the court of the specific use to which the owner intends to develop his property and the order framed in reference to it, *Sinclair Pipe Line v Village of Richton Park* [19 Ill 2d 370; 167 NE2d 406 (1960)]." *Harshman v De Kalb,* 64 Ill App 2d 347, 353; 212 NE2d 146, 149 (1965).

See, generally, *Flair Corp v Brecksville,* 49 Ohio App 2d 77; 3 Ohio Op 3d 146; 359 NE2d 459 (1976) (remand to determine specific use[s] to which plaintiff land could reasonably be put); *Ellick v Board of Supervisors,* 17 Pa Commonwealth Ct 404; 333 A2d 239 (1975) (remand pursuant to statutory authority to determine the reasonableness of plaintiff's proposed specific use).

and ordered defendant to "permit the plaintiff to build and develop said property as a trailer park". 359 Mich 634, 637.

On appeal, four Justices directed summary affirmance of the chancellor's order, three Justices urged reversal on the ground that plaintiff had merely presented a debatable question which the Court was not empowered to disturb, and Justice BLACK urged affirmance on condition. The trial court's decree affirmatively permitting the use of the subject parcel for trailer park purposes was summarily upheld.

In his separate opinion for affirmance on condition, Justice BLACK reacted to what he perceived to be the harsh result sanctioned by the majority of either invalidating "defendants' too-restrictive ordinance", thereby implicitly rendering the subject parcel unzoned, or granting "plaintiff's prayer for specific relief" as was done in the lower court's order permitting plaintiff's proposed specific use as a trailer park. Rejecting the appropriateness of forcing the Court into the "inexorable choice" of granting either one land use extreme or the other, the Justice opined that a more equitable "midsatisfactory" use of the subject parcel could perhaps be better arrived at by remanding the matter to the chancellor *via* the appropriate municipal zoning body for further proceedings. We quote at length Justice BLACK's remarks in this regard:

"An over-concentration of trailer coach living undoubtedly creates problems of municipal concern such as the superintendent has described. The appealing need for solutional aid stares at us from the appendix, yet the usual extremes of affirmance or reversal appear as marking all limits of the judicial function. But do they? Looking upward and outward at the great horizons of equity, and recalling that the shape of decretal

relief should as a rule be formed by the chancellor
according to germane conditions and equities as same
may be shown to exist at the time of final decree
(*Herpolsheimer v A B Herpolsheimer Realty Co,* 344
Mich 657 [75 NW2d 333 (1956)]; *Carlson v Williams,* 348
Mich 165 [82 NW2d 483 (1957)]), it would seem that
there need be no inexorable choice, now at least, be-
tween plaintiff's prayer for specific relief and defen-
dants' too-restrictive ordinance. Why cannot plaintiff
and the defendant city consider, together, some possibly
midsatisfactory use such as light manufacturing, or
retailing, or neighborhood-acceptable commercial en-
deavor? Why must the permitted use be a this-or-that
showdown between temporary life in mobile coaches—
or nothing? Does not equity have a duty here, the
public interest being at prominent stake? Why not give
the parties a chance to answer these questions, in the
court below, prior to entry of final decree?

"I would remand by special order (see Court Rule No
72, § 1 [1945]) authorizing the city to present, for judi-
cial consideration below if it will, an amendatory ordi-
nance which in so many words relieves plaintiff's tract
from the present R-1 designation and provides some less
restrictive designation conforming—as the city may be
advised—with the requirements of constitutional rea-
sonableness; such amendatory ordinance to be adopted
and submitted to the successor chancellor within 60
days from the date of such order. The order should
provide that, if the city elects not to amend and submit
as authorized, due report of that fact shall thereupon be
made to this Court by the successor chancellor, where-
upon our decree of affirmance will enter. It should also
provide, for the event of amendment and submission so
authorized, that further disagreement of the parties, if
any, should be reported by the chancellor to this Court
with accompanying certified record of such additional
proceedings as may be ordered and supervised by him."
359 Mich 634, 642-643.[11]

---

[11] This Court in *Frendo v Southfield Twp,* 349 Mich 693; 85 NW2d
130 (1957), also recognized the need when fashioning zoning relief to
"balance the conflicting equities and try to reach a fair working result
consistent with the dilemma before us". 349 Mich 693, 698. In this
regard, the Court stated:

"Few decisions in any such zoning cases fail to harm and displease

We find most instructive Justice BLACK's championship of the need to balance competing equitable considerations upon remand to the appropriate municipal zoning body for timely presentation of an adopted amendatory ordinance to the chancellor for a determination of the "midsatisfactory" use to be accorded the subject parcel. It is manifest to this Court that the inevitable tension between landowners and municipal zoning authorities subsequent to a judicial finding of classification invalidity can perhaps best be resolved only through a consideration and balancing of the competing equities revolving about the particular use to be made of a plaintiff's parcel at both the legislative and judicial levels.

V. CONCLUSION: REMAND TO THE CHANCELLOR
FOR A DETERMINATION OF THE MOST EQUITABLE
USE TO BE MADE OF PLAINTIFFS' PARCEL
WITHIN THE R-3 ZONING CLASSIFICATION

In resolving the questions of (i) what effect is to be accorded an ordinance's judicially declared invalidity, and (ii) what judicial procedure is to be undertaken in fashioning such effect, the line of cases discussed above provide us with the following alternatives:

---

someone; our job is try to balance the conflicting equities and try to reach a fair working result consistent with the dilemma before us. We grant, then, that any relief given here to the plaintiffs will to some extent harm home owners in the vicinity. Yet a denial of relief will most certainly affect the plaintiffs; they will be left to pay taxes on lots which we believe the proofs plainly show are entirely unusable for the purposes to which by this ordinance they are restricted." *Id.*

The *Frendo* Court, however, was not disposed to direct remand for a determination of the "midsatisfactory" use to be accorded the subject parcel as was Justice BLACK in *Dequindre, supra.* Rather, having found the disputed single-family zoning classification unconstitutional, the Court ordered that the defendant permit a use of the parcel consistent with the general commercial use classification prayed by plaintiff.

(1) render the subject parcel unzoned until either a use is instituted or the parcel is rezoned, *Daraban* (dissent), *supra;*

(2) enjoin defendant from enforcing a land use restriction more restrictive than that determined appropriate by the court, *Long* and its progeny, *supra;*

(3) enjoin defendant from such interference and affirmatively order the institution of plaintiff's proposed specific use on the parcel, *Daraban* (majority), *supra;*

(4) enjoin defendant from enforcing the unconstitutional classification but remand the matter to the appropriate municipal zoning authority to present, for the chancellor's consideration within 60 days of this Court's or the appropriate reviewing court's order of unconstitutionality, an adopted amendatory ordinance comporting with the dictates of equity as well as the requirements of constitutional reasonableness as applied to an aggrieved landowner's parcel, see *Dequindre* (separate opinion of Justice BLACK), *supra;* or,

(5) remand, per the LEVIN opinion, exclusively for an administrative hearing to determine an appropriate use of plaintiff's parcel.

Considering these alternatives, we find (1) unacceptable for the reasons stated *supra,* that such action would potentially render the parcel subject to uses neither argued for by plaintiff nor consistent with the orderly development of the community and abutting lands. We similarly find that alternative (2) may be too expansive in scope and therefore undesirable insofar as it sanctions development of the subject parcel in any manner enumerated under the ordered general zoning classification whether or not such use would be deleteri-

ous to the surrounding community. Alternative (3)
is likewise rejected for the reason that it may be
too restrictive in scope in its dismissal of other
perhaps more equitable uses to which the parcel
could theoretically be put but for the plaintiff's
prayer for a proposed specific use. Finally, Justice
LEVIN's recommended position, (5), is contrary to
the general posture assumed by a majority of this
Court in the area of land use classification review
for the reasons stated *supra.*

Therefore, rejecting alternatives (1), (2), (3) and
(5), we find that alternative (4) embodies the cur-
rent thinking of this Court in recognition of the
inherent equitable nature of zoning classifications,
challenges thereto, and the institution of uses on
particular parcels of land which exist, not in a
vacuum, but within a dynamic community. Such a
"balancing of the competing equities" approach
adopted by this Court today ensures the orderly
and equitable development of the communities of
our state; it similarly provides affected parties
with a competent, disinterested, and reflective fo-
rum for the resolution of land use grievances
guided by notions of equity while concurrently
affording the legislative branch of our state gov-
ernment necessary deference.

For the reasons set forth in this opinion, we
affirm the trial court's finding of unconstitutional-
ity.

Further, we order that this matter be remanded
to defendant city council to present, for the chan-
cellor's consideration within 60 days of this order,
an adopted amendatory ordinance comporting with
the dictates of equity as well as the requirements
of constitutional reasonableness as applied to
plaintiffs' parcel.

Upon the expiration of or within this 60 day

period, the chancellor shall enter one of the following orders:

(i) If, after remand to defendant city council, plaintiffs and defendant find defendant's submitted amendatory ordinance mutually acceptable, the chancellor shall order the implementation of such amendatory ordinance.

(ii) If, after remand to defendant city council, defendant submits an amendatory ordinance unacceptable to plaintiffs but embodying Justice BLACK's "midsatisfactory use" as determined by the chancellor through a balancing of equitable considerations, the chancellor shall order the implementation of such midsatisfactory amendatory ordinance.

(iii) If, after remand to defendant city council, defendant submits an amendatory ordinance unacceptable to plaintiffs and plaintiffs submit a proposed use embodying Justice BLACK's "midsatisfactory use" as determined by the chancellor through a balancing of equitable considerations, the chancellor shall order the implementation of plaintiffs' proposed "midsatisfactory use".

(iv) If, after remand to defendant city council, neither plaintiffs nor defendant can agree upon the other's amendatory ordinance or proposed use and the chancellor determines that neither party's proposal embodies Justice BLACK's "midsatisfactory use", the chancellor shall order the implementation of a midsatisfactory use after both plaintiffs and defendant as well as other affected parties have had the benefit of a hearing and the submission of proofs to determine the most equitable or midsatisfactory use to be made of plaintiffs' parcel.

(v) If, after remand to defendant city council, defendant does not submit an adopted amendatory

ordinance to the chancellor for consideration within 60 days of this Court's order, we direct the chancellor to conduct a hearing supplemented by the submission of proofs by all affected parties to determine and implement the most equitable or "midsatisfactory use" to be made of plaintiffs' parcel.

Of course, if either party is dissatisfied with the chancellor's order, an appeal is permitted from that order under normal procedures of *de novo* review. We note that this ruling is to be accorded limited retroactive effect as to all actions hereafter commenced as well as all actions heretofore commenced and now pending in either the trial or appellate courts.

Affirmed in part, modified in part, and remanded. No costs, a public question being involved.

### *Zaagman v City of Kentwood*

Little need be remarked about this case. We affirm the Court of Appeals finding of constitutionality on the ground that plaintiff has failed to meet its burden to affirmatively prove that either defendant's ordinance is arbitrary and unreasonable or that no reasonable governmental interest is advanced by the present zoning classification. *Kirk, supra; Kropf, supra.* Plaintiff has not made out a case for either a denial of substantive due process or denial of equal protection.

Affirmed. Costs awarded to defendant.

COLEMAN, C.J., and FITZGERALD and RYAN, JJ., concurred with WILLIAMS, J.

BLAIR MOODY, JR., J., took no part in the decision of this case.

Levin, J. *(for affirmance and remand).* We all agree, in *Turkish,* that the owners succeeded in proving that their undeveloped land could not feasibly be developed for the permitted use, and that the cause should be remanded to the city for further proceedings. We do not agree with the post-remand procedures prescribed in the opinion of the Court.

In *Zaagman,* the owners failed to prove the unconstitutionality of the zoning of their undeveloped land.

## I

In *Kropf v Sterling Heights,*[1] concurring with the majority, I expressed the view that the action of a local authority in changing or denying a change in zoning "on individual grounds is administrative, not legislative", and that "the reasonableness of the proposed use" was "the standard *in fact* generally followed by a local legislative body when granting or refusing a change [emphasis supplied]", and that since the question was "quasijudicial and affect[s] private rights" the merits were, under this state's constitution, subject to judicial review to determine whether the grant or denial was "supported by competent, material and substantial evidence on the whole record".[2]

Seven months later, in *West v Portage,*[3] this Court held that an amendment to a city's zoning ordinance was not subject to referendum. I wrote the lead opinion, which received three signatures; our conclusion was based on the view that an

---

[1] *Kropf v Sterling Heights,* 391 Mich 139, 164; 215 NW2d 179 (1974).

[2] Const 1963, art 6, § 28.

[3] *West v Portage,* 392 Mich 458; 221 NW2d 303; 72 ALR3d 1018 (1974).

amendment such as there presented was "an administrative, not a legislative, act". A fourth Justice concurred in the result.

A year later, in *Sabo v Monroe Twp*,[4] this Court affirmed decisions of the Court of Appeals in three cases, *Sabo*, *Smookler*,[5] and *Nickola*.[6] The Justices who signed the lead opinion in *West* also signed my opinion in *Sabo* which, through the happenstance that only five Justices were participating, became the opinion of the Court.

In *Sabo*, *Smookler* and *Nickola* the Court of Appeals agreed with the plaintiffs that they should be allowed to use land zoned for other uses to construct mobile home parks. Four of the five Justices participating voted to affirm the Court of Appeals. In a separate opinion for affirmance Justice WILLIAMS said that the zoning was confiscatory as applied to Sabo's land because it could not be feasibly used as zoned, and that exclusionary zoning had been proven in *Smookler* because no specific land in the township had been zoned for mobile home parks and in *Nickola* because mobile homes had been excluded from all but one-tenth of one percent of the township. The majority stated that it did not agree with Justice WILLIAMS "that on proof that a community has excluded a legitimate use, here mobile home parks, it necessarily becomes obliged to grant a request for rezoning to permit that use. The land sought to be rezoned may not be suitable for development for the excluded use".[7]

---

[4] *Sabo v Monroe Twp*, 394 Mich 531; 232 NW2d 584 (1975), *aff'g* 46 Mich App 344; 208 NW2d 57 (1973).

[5] *Smookler v Wheatfield Twp*, 394 Mich 574; 232 NW2d 616 (1975), *aff'g* 46 Mich App 162; 207 NW2d 464 (1973).

[6] *Nickola v Grand Blanc Twp*, 394 Mich 589; 232 NW2d 604 (1975), *aff'g* 47 Mich App 684; 209 NW2d 803 (1973).

[7] *Sabo v Monroe Twp, supra,* pp 535-536.

While the majority, adverting to the concept expressed in my concurring opinion in *Kropf,* said that "[e]ven if present zoning is not unreasonable or confiscatory, a proposed use *should* be permitted if reasonable under all the circumstances [emphasis supplied]", and "[w]e *would* require that the proofs now adduced in circuit court be presented administratively and restrict judicial review to whether the record evidence supports the administrative finding on the issue whether the proposed use is reasonable [emphasis supplied]", we said that had not been the applicable rule of law: "However, it is the present practice to present the proofs in circuit court and for a reviewing court to make its own independent examination and analysis of the record. *Kropf v Sterling Heights, supra* (majority opinion)".[8]

We then noted that the Court of Appeals, upon examination of the record, had decided the proposed uses should be allowed and the record established they were reasonable. On that ground we joined with Justice WILLIAMS in affirming the Court of Appeals:

"In each of these cases the Court of Appeals held that the proposed use should be allowed. The record in each establishes that the proposed use (which happens to be a partially or totally excluded use) is reasonable. On that ground we join in affirming the decision of the Court of Appeals."[9]

Thus, while we could not join with Justice WILLIAMS either in concluding that the *Sabo* zoning was not feasible[10] or that mobile home park use should be authorized merely because exclusionary

[8] *Id.,* pp 536-537.

[9] *Id.,* p 537.

[10] See *Sabo v Monroe Twp, supra,* p 536, fn 5.

zoning had been proven, we joined with him in affirming the decisions of the Court of Appeals because, in apparent observance of the operative standards set forth in the majority opinion in *Kropf* (which we said "should" be changed and which we "would" change), it had made its own independent examination and analysis of the record and determined that the proposed uses should be allowed and because it appeared to us that the record further established that the lands were suitable for development for the excluded use. The partially or totally excluded uses, mobile home parks, would be compatible with nearby uses and would not impair community development and were thus reasonable.

Before *Sabo* was decided, the Court of Appeals had decided *Werkhoven v Grandville,*[11] *Turkish v City of Warren,*[12] and *Ed Zaagman, Inc v Kentwood.*[13] A few weeks later, we remanded *Werkhoven* to the Court of Appeals. Although the remand was not for reconsideration in light of the opinion of the Court but, rather, for reconsideration "in light of the opinion*s* of the Justice*s* [emphasis supplied]" in *Sabo, Smookler* and *Nickola,* the *Werkhoven* order[14] was read by some as indicating that the substantive standard which the *Sabo* majority said "should" be adopted and the procedure it said it "would" require had become the law. We granted leave to appeal in *Turkish* and *Zaagman.*

In *Turkish* the Court of Appeals had concluded that single-family residential development was not

---

[11] *Werkhoven v Grandville,* 61 Mich App 200; 232 NW2d 356 (1975).

[12] *Turkish v City of Warren,* 61 Mich App 435; 232 NW2d 732 (1975).

[13] *Ed Zaagman, Inc v Kentwood,* 61 Mich App 693; 233 NW2d 146 (1975).

[14] 395 Mich 753; 232 NW2d 671 (1975).

feasible and hence the zoning was confiscatory and affirmed the trial court's grant of injunctive relief. It stated, however, that it would prefer to withhold injunctive relief and remand for further proceedings because, although plaintiffs' proposed use for multiple-family dwellings appeared reasonable, the record was insufficient to enable the court to determine whether the city's action in denying the request for rezoning was supported and suggested adoption by this Court of the administrative/legislative analysis. In *Zaagman* the Court of Appeals, on the authority of *Kropf,* reversed a grant of injunctive relief which would have permitted development of a mobile home park on land zoned for other residential uses.

Shortly after *Turkish* and *Zaagman* were argued *Kirk v Tyrone Twp* [15] stated that *Sabo* had adopted the concurring opinion in *Kropf* and then proceeded to overrule it, and reiterated adherence to the principles stated in *Kropf.* Today the Court reaffirms its adherence to those principles.

It is perhaps understatement to say that the Court does not embrace the view espoused by me in the concurring opinion in *Kropf.*

The crux of the argument for regarding a change in zoning on individualized grounds as administrative is that the state cannot constitutionally make an individualized decision, "quasi-judicial and affect[ing] private rights", that is not subject to judicial review on the merits. Const 1963, art 6, § 28. *Kropf* was not a direct appeal from a denial of a zoning change, but rather, as here, an action challenging the constitutionality of the zoning. The issue whether a local legislative body is acting in an administrative capacity and must observe procedures appropriate to individual-

---

[15] *Kirk v Tyrone Twp,* 398 Mich 429; 247 NW2d 848 (1976).

ized decision-making when considering such a zoning change can be duly presented and decided only in a case where such a zoning change, granted or denied, is challenged *on direct appeal* on the ground that it was not "supported by competent, material and substantial evidence on the whole record". Const 1963, art 6, § 28.

## II

The focus in the opinion of the Court and this opinion on the question whether zoning changes are necessarily legislative or can be administrative in nature may tend to obscure what is at issue and is decided in the instant cases and the substantial agreement of the members of the Court on what is being decided in *Turkish.*

While we continue to disagree on whether individualized zoning changes are administrative and thus subject to constitutional limitations regarding the procedures by which such decisions may be made and requirements of judicial review on the merits, we all agree in *Turkish* that

—the owners proved that their undeveloped land could not feasibly be developed for the permitted use.

—existing procedures, following a judicial determination of unconstitutionality, should be modified to provide the city an opportunity to show that the land should not be used as the owner proposes. Although the existing zoning is unconstitutional as applied, it does not follow the land may be used as the owner wishes.

—if there is more than one feasible use for the land, the city's choice should generally prevail.

—the question of alternative feasible uses and the impact of the owner's and city's proposed uses

on surrounding uses and future community development should be the subject of an evidentiary hearing, and decision should be based on the record made at that hearing.

—the decision is subject to judicial review on the merits.

Our disagreement concerns whether the hearing should be conducted by the local legislative body (or an agency or officer designated by it) or by the circuit court, the articulation of the standard for decision and the scope of judicial review.

We would require that the hearing be conducted by or for the local legislative body. Its choice should not be made before the record is developed. Its choice is likely to be more intelligent and responsible if made after presentation of all the evidence. A circuit judge may wonder whether the city would have made a different choice if it had had the benefit of the evidence later presented to him.

While many communities do not have experience in conducting administrative hearings in zoning matters, recent amendments to the city and village, township and county enabling acts[16] require all communities exercising zoning power to provide, on applications for special land uses and planned unit developments, for public hearings, standards for decision, procedures and a statement of the basis of decision. As a result, most communities are now required to develop a hearing capacity.

The Court states that the standard for decision is whether the city's alternative use or uses comports "with the dictates of equity as well as the

[16] 1978 PA 637, 1978 PA 638 and 1978 PA 640; MCL 125.286b *et seq.*, 125.584a *et seq.*, 125.216b *et seq.*; MSA 5.2963(16b) *et seq.*, 5.2934(1) *et seq.*, 5.2961(16b) *et seq.*, amending the township, city and village and county zoning enabling acts.

requirements of constitutional reasonableness as applied to an aggrieved landowner's parcel". We would judge the city's alternative use or uses by the same standard applied in deciding whether the existing zoning is valid—reasonableness as applied to the property. Hence, if there is more than one feasible use, the city's choice, unless unreasonable as applied, should govern.

Nor do we think that the scope of judicial review should include "a balancing of equitable considerations". Even if there is a preference for judicial fact finding, the judge's role should be confined to a determination whether the city's alternative proposed use or uses are unreasonable as applied to the property.

III

The Court's apparent conclusion that a zoning case sounds in equity is an offshoot of the procedural posture of many zoning challenges on constitutional grounds. While some property owners have sought mandamus, certiorari, superintending control or a declaratory judgment, the practice has evolved of filing a bill of complaint seeking injunctive relief against enforcement of the zoning ordinance. Because equitable relief was sought, the case was on the equity side of the court. Thus, in *Hitchman v Oakland Twp,*[17] the Court said that an action to enjoin the enforcement of a zoning ordinance was a "suit in equity". When that Court turned "to a consideration of the proofs submitted by the parties", it said that "[t]his being an equity case, we hear it *de novo.* [Citation omitted.] While we give due consideration to the findings of the

[17] *Hitchman v Oakland Twp,* 329 Mich 331, 333, 335-336; 45 NW2d 306 (1951).

trial judge, nonetheless it is our duty to weigh the evidence and reach an independent conclusion".

The Court today expands this procedural concept into a substantive standard which clothes the circuit judge, dubbed "chancellor", with the power to reject the community's choice "through a balancing of equitable considerations". Although this Court withholds the equitable relief sought, remanding the case to the city for further proceedings, and equitable relief may never be granted, it nevertheless evokes the equitable nature of the relief sought as justifying the substantive standard and procedures prescribed by it.

All that has been decided at this juncture is that the Turkish land cannot feasibly be used as zoned; a declaratory judgment to that effect could properly enter. The subsequent judicial role should be limited to a determination whether the record shows that the city has provided the owners with a feasible alternative use that is not unreasonable as applied. The city's decision in that regard, if adequately supported by the record, should govern. If it appears that there is foot-dragging or that the city is acting in bad faith, the court then can be asked to act. I would not anticipate that need or articulate a substantive standard or establish procedures on an assumption that the city will not act responsibly.

It is also noteworthy that the reviewing standard, even in equity cases, is no longer described as *"de novo"*. GCR 1963, 517, states that "[i]n all actions tried upon the facts without a jury * * * [f]indings of fact shall not be set aside unless clearly erroneous". Further, GCR 1963, 11, provides that "[t]hese rules govern the practice in the circuit courts * * * in actions of a civil nature whether heretofore cognizable as actions at law or

in equity". It has been said that the clearly erroneous standard is the standard applied in equity before the distinction between law and equity actions was abolished.[18] In *Tuttle v Dep't of State Highways,*[19] we adopted the following formulation of the clearly erroneous standard: " '[A] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " The clearly erroneous/*de novo* standard thus relates to appellate review of a judge's findings of fact. It is not a substantive legal standard against which the facts so found are to be judged, nor does it change the scope or nature of the judicial function or of judicial review.

## IV

In *Turkish*, the owners of 4.83 undeveloped acres contend that the City of Warren's zoning ordinance is invalid as applied because it is not

[18] "Rule 517 prescribes a single standard of review for court findings in all actions, legal or equitable, tried without a jury. The standard is essentially that of the former equity practice. The standard is that findings of fact shall not be set aside unless 'clearly erroneous.'

"Formerly in chancery cases, although it was commonly said that issues of fact were tried *de novo* on appeal or that the Supreme Court must weigh the evidence and reach an independent conclusion on review of the facts, this did not mean that the findings of the trial judge were entitled to no consideration. * * * The Supreme Court was most reluctant to disturb the findings of a trial judge based on credibility, since the trial judge, as the trier of facts, had the advantage of observing the witnesses.

* * *

"Thus it is clear that Rule 517 accurately restates former practice in the review of chancery cases in Michigan, although the language itself is borrowed from Federal Rule 52." 2 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), pp 596-597.

[19] *Tuttle v Dep't of State Highways,* 397 Mich 44, 46; 243 NW2d 244 (1976).

economically feasible to develop the parcel as zoned and the present zoning is therefore confiscatory and constitutionally invalid.

The land, with a house on it, was purchased for $17,000 in 1956 by the Turkishes as a home for his parents. Nearly all the surrounding land was then undeveloped farm land except for a single family subdivision immediately to the south.

By 1966 nearly all the surrounding land had been developed as single-family residences with the exception of some land to the north. That year the owners of parcels to the north sought to plat and develop their property. Turkish's parents still lived on the property and he declined to join in the development.

In 1968, the owners to the north petitioned to have their zoning changed to permit multiple dwellings. Turkish objected because the petition did not include plans for unified development with his land; he feared that his property would be "landlocked". He had previously discussed this potential situation with the city planner. The petition was withdrawn.

The following year, the city council approved the plat of a subdivision immediately north of the Turkish parcel. Turkish challenged the council's action in circuit court on the ground that he had not received adequate notice of the council's hearing and had previously been assured by the city planner that the surrounding property would not be platted without a unified road system. The court dismissed the action and no appeal was taken.

The Turkishes then sought to change the zoning of their parcel from single-family residential to multiple-family residential (R-3). The city council denied the zoning change.

The Turkishes commenced the instant action. The circuit court held that because development costs would be equal to or greater than the price at which the developed parcel could be sold, the zoning was confiscatory and unconstitutional as applied to the Turkish parcel. The court enjoined the city from "interfering with plaintiffs' use of the property in accordance with R-3 zoning". The Court of Appeals affirmed.

## A

The legislative power to regulate the use of land, although the regulation may have an adverse affect on value, is well established.[20]

It is claimed that the zoning as applied violates substantive due process because the sum of the land value, cost of development and a reasonable return exceeded the price at which the developed land could be marketed.

The United States Supreme Court has said that the Federal constitutional proscription against "taking" without compensation may include governmental action that diminishes the value of property even if there is no physical appropriation.[21] The Court has further said that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking".[22]

---

[20] See *Austin v Older,* 283 Mich 667, 676-677; 278 NW 727 (1938); *Village of Euclid v Ambler Realty Co,* 272 US 365; 47 S Ct 114; 71 L Ed 303; 54 ALR 1016 (1926).

[21] See *United States v Kansas City Life Ins Co,* 339 US 799, 810; 70 S Ct 885; 94 L Ed 1277 (1950); *cf. San Diego County v Miller,* 13 Cal 3d 684, 691; 119 Cal Rptr 491, 495; 532 P2d 139 (1975); Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law,* 80 Harv L Rev 1165, 1190-1193 (1967).

[22] *Pennsylvania Coal Co v Mahon,* 260 US 393, 415; 43 S Ct 158; 67 L Ed 322 (1922).

An owner of land is not entitled to a maximum return on his investment or to the "highest and best" use of his land. This Court has nevertheless held that "an ordinance that prevents the property owner from making any beneficial use of his property is both unreasonable and confiscatory. * * * The use imposed by the ordinance must be feasible use".[23]

## B

The Turkishes introduced evidence tending to show that if they developed their narrow parcel (1300' × 160') for single-family houses as required by the zoning ordinance and in accordance with set-back, street-width and lot-size requirements, they could only plat one street with one row of 19 lots.

In a letter to the City Attorney, the City Engineer estimated the costs of developing the parcel as zoned to be $103,000. The Turkishes' expert witness testified that the development cost would be between $135,000 and $136,000 or approximately $7,100 per lot.

The principal disputed issue at trial was the price at which lots could be sold. The city's expert testified that the present market value of the parcel when developed would be between $6,600 and $7,200 per lot. The Turkishes' expert said the value would be less than $8,000.

It therefore appears, as the circuit court found, that the parcel cannot be used as zoned because

[23] See *Bassey v Huntington Woods,* 344 Mich 701, 704-705; 74 NW2d 897 (1956).

Similarly, see *Smith v Village of Wood Creek Farms,* 371 Mich 127, 136; 123 NW2d 210 (1963); *Frendo v Southfield Twp,* 349 Mich 693; 85 NW2d 130 (1957); *Nectow v City of Cambridge,* 277 US 183; 48 S Ct 447; 72 L Ed 842 (1928).

the cost of developing it for single-family housing, without allowing for a reasonable return and the undeveloped land value, is nearly equal to its value as developed, making development as zoned unfeasible. No owner would develop his property unless the value as developed substantially exceeds the cost of developing it and the basic speculative land value.

Although the judge found that the parcel had a market value of approximately $35,000, that does not mean that the parcel as zoned can be feasibly *used*, but may simply reflect the value of the property *if* rezoned less the cost and risk of obtaining rezoning.

Although "the ordinance comes to us clothed with every presumption of validity", plaintiffs sustained their burden, under *Kropf*,[24] as reaffirmed in *Kirk*,[25] of proving that the zoning is confiscatory as applied to their parcel: "[I]f the ordinance is enforced the consequent restrictions on [their] property preclude its use for any purposes to which it is reasonably adapted."

## C

The city contends that the Turkishes are not entitled to a zoning change because they had an opportunity to develop their land, but decided not to do so at the time.

Viewed historically, the equities and lost opportunities run in both directions. It is quite possible that had the Turkishes and the city approached the development of the parcel and the surrounding land differently the Turkishes would not now own an undeveloped parcel. Notwithstanding what oc-

---

[24] *Kropf v Sterling Heights, supra,* pp 162-163.
[25] *Kirk v Tyrone Twp, supra,* pp 439-440.

curred in the past, the proofs showed that the zoning as applied to the parcel precludes development of the permitted single-family residence use. Whether in hindsight the Turkishes should have developed their parcel earlier, and even if they purchased the parcel knowing that as zoned it could not be used,[26] the ordinance now precludes any feasible use of the property.

## D

The judicial determination that the ordinance as applied to the Turkish parcel is unconstitutional should not mean that the Turkishes are necessarily entitled to use the property for multiple-family residences. The surrounding owners have an interest in how the Turkish property is developed, as does the city in providing for orderly development, consistent with its master plan, with adequate services and protection of aesthetic and environmental values. Accordingly, although the Turkishes' proposed use may appear to a court to be "reasonable", there may be other feasible means of developing single-family homes on the parcel if the city permits variances regarding street width and lot size or under other circumstances. The parcel might also be used, consistent with the present zoning, for schools, religious institutions, or some other use. Although uses consistent with present zoning may not be feasible, it may be that some use other than multiple residences is feasible and more compatible with competing interests.

The question of how best to accommodate the interests of the Turkishes, the neighboring owners, and the city should be decided by the local zoning

---

[26] See *Kropf v Sterling Heights, supra,* p 152.

authority and not by a court, although subject to judicial review.

## V

The nature of proceedings before a local zoning authority has divided this Court,[27] and has been given considerable attention by commentators.[28]

The traditional approach has been to regard all zoning changes as legislative because they are made by local legislative bodies, generally by way of amendment of the existing zoning ordinance. The ordinance and any changes made in it are given a presumption of validity and an approval or refusal to approve a zoning change is reviewable by a court only to determine whether the zoning is confiscatory, denied substantive due process by not furthering a legitimate governmental interest or

---

[27] See *Sabo v Monroe Twp, supra; West v Portage, supra; Kropf v Sterling Heights, supra; Kirk v Tyrone Twp, supra.*

[28] See Cunningham, *Rezoning by Amendment as an Administrative or Quasi-Judicial Act: The "New Look" in Michigan Zoning,* 73 Mich L Rev 1341 (1975); Lax, *1974 Annual Survey of Michigan Law, Local Government,* 21 Wayne L Rev 577 (1975); Cohn & Polito, *Administrative Zoning Change: Give it a Chance,* 54 Mich St B J 956 (Dec, 1975); Ternan, *Michigan Zoning: A Need for Clarity and Stability,* 55 Mich St B J 33 (Jan, 1976); Crawford, *Administrative Zoning Change— Prospects and Problems,* 54 Mich St B J 854 (Nov, 1975); Anthony, *Rezoning Procedure: A Dramatic Change,* 54 Mich St B J 855 (Nov, 1975).

See, also, ABA Advisory Commission on Housing & Urban Growth, *Housing For All Under Law* (Fishman, ed. Cambridge, Mass: Ballinger Publishing Co, 1978), pp 268 *et seq.; Developments in the Law —Zoning,* 91 Harv L Rev 1427, 1508 (1978); Levy, *Judicial Review of Zoning Cases—New Rules?,* 6 Tulsa L J 1 (1969); Booth, *A Realistic Reexamination of Rezoning Procedure: The Complementary Requirements of Due Process and Judicial Review,* 10 Ga L Rev 753 (1976); Sullivan, *Araby Revised: The Evolving Concept of Procedural Due Process Before Land Use Regulatory Bodies,* 15 Santa Clara Lawyer 50 (1974); Freilich, *Editors Comments—Fasano v Board of County Commissioners of Washington County: Is Rezoning an Administrative or Legislative Function?,* 6 Urban Lawyer vii (1974); Comment, *Developments in the Search for Workable Standards of Judicial Review of Piecemeal Rezoning,* 24 Catholic U L Rev 294 (1975).

denied equal protection by excluding all or nearly all of a particular use.[29]

A different approach was suggested by a few courts during the 1950's and 1960's with respect to referendum provisions,[30] given impetus by a law review comment,[31] and now has been adopted in several jurisdictions,[32] endorsed by the ABA Advisory Commission on Housing and Urban Growth[33]

[29] One observer characterizes the traditional approach as empowering local legislative bodies

"to change the zoning classification of land at will or to refuse to change it, regardless of what record is made in the proceedings before them, so long as they do not place the land in a zoning category which does not permit reasonable use and enjoyment thereof." Crawford, *supra*, p 854.

[30] See *Bird v Sorenson*, 16 Utah 2d 1; 394 P2d 808 (1964); *Donovan v Clark*, 222 F Supp 632, 634 (D DC, 1963); *Morton v Mayor & Council of Clark Twp*, 102 NJ Super 84; 245 A2d 377 (1968); *Minneapolis-Honeywell Regulator Co v Nadasdy*, 247 Minn 159; 76 NW2d 670 (1956); *Kelley v John*, 162 Neb 319, 323-325; 75 NW2d 713 (1956); *Golden v Overland Park*, — Kans —; 584 P2d 130 (1978).

The Oklahoma Supreme Court adopted the quasi-judicial approach in *Sand Springs v Colliver*, 434 P2d 186 (Okla, 1967), but overruled that decision in *O'Rourke v Tulsa*, 457 P2d 782 (Okla, 1969). See Levy, *supra*, p 19.

[31] Comment, *Zoning Amendments—The Product of Judicial or Quasi-Judicial Action*, 33 Ohio St L J 130 (1972).

[32] See *Fasano v Washington County Board of Commissioners*, 264 Or 574; 507 P2d 23 (1973); *Fleming v Tacoma*, 81 Wash 2d 292, 298-300; 502 P2d 327, 330-331 (1972); *Snyder v Lakewood*, 189 Colo 421; 542 P2d 371 (1975); *Lowe v Missoula*, 165 Mont 38, 45-47; 525 P2d 551, 554 (1974); *Forman v Eagle Thrifty Drugs & Markets, Inc*, 89 Nev 533, 536-537; 516 P2d 1234, 1236 (1973).

See, also, *Ward v Skokie*, 26 Ill 2d 415, 423-424; 186 NE2d 529, 533 (1962) (concurring opinion); *City of Eastlake v Forest City Enterprises, Inc*, 426 US 668, 685, fns 6, 7; 96 S Ct 2358; 49 L Ed 2d 132 (1976) (Stevens, J., dissenting).

[33] The American Bar Association Advisory Commission on Housing & Urban Growth adopted a number of policy statements "which summarize the major themes and findings of its report", including the following:

"1. A primary concern in facilitating rational and equitable urban growth is the extent to which the traditional system of land-use controls has evolved into a highly discretionary process. While this development has its salutary aspects, particularly in permitting local government to respond to the increased complexities of land-use decision-making, it has also strained the fairness and rationality of the regulatory system.

"Because of the issues involved in reconciling discretionary action
with procedural fairness, Chapter 4 in part concerns the legal distinc-
tion between 'legislative' and 'administrative' or 'quasi-judicial' ac-
tions. The discussion of these labels, however, should not be empha-
sized to the point of distraction from the underlying concepts. The
issue is one of procedural fairness and predictability that is adaptable
to local conditions and capabilities. The use of terms such as cross-
examination, fair and impartial tribunal, and the like, need not be
interpreted in the same sense as they might be in an attempt to
reform the judicial process.

"2. A government body, in granting or denying development per-
mission for a specific parcel of land at the request of a particular
party, is engaged in an adjudicatory process. As such, the essentials of
procedural due process normally expected of administrative bodies—
adequate notice, an opportunity to be heard, a fair and impartial
tribunal, and findings based on an adequate record—must be met.
Furthermore, such local actions, when reviewed by the courts, need
not be accorded the traditional presumption of legislative validity.

"Traditionally, courts have viewed all amendments to a zoning
ordinance as legislative acts, because they are granted by the local
legislature. Consequently, such actions have been accorded a pre-
sumption of legislative validity. Under this presumption, challenges
to the validity of a local action have been required to demonstrate
that the decision is arbitrary, capricious, and unreasonable, and that
it has no relation to the public health, safety, and welfare—an
extremely onerous burden. The Advisory Commission recognizes that
the local legislature, in enacting or amending a zoning ordinance
applicable to all or a substantial part of a political jurisdiction, is
acting in a different role from the one it assumes when making a
decision on requests by parties or individuals for particular changes
from the general scheme. The latter role is more akin to that of
settling disputes, and therefore, to promote greater fairness and avoid
the risk of arbitrariness, should be afforded greater due process
standards. This approach does not affect text amendments applying to
classes of land use or a collection of parcels within an area, compre-
hensive or planning area rezonings, and adoption of the comprehen-
sive plan (in whole or by area); such actions should retain their
'legislative' characterization and be subject to the traditional stan-
dards of judicial review. The legislative characterization may continue
to be appropriate for individual requests for development permission
that have a substantial or disproportionate impact on the community,
regardless of the size of the parcel or parcels at issue.

"3. State zoning enabling legislation should be amended so as to
specify the requirements for administrative review of individual
requests for zoning changes or development permission. Such legisla-
tion should be responsive to the varying financial capabilities and
development activity existing in political jurisdictions of differing
sizes, which would affect their ability to implement a sophisticated
administrative process. (Small communities, for example, may lack
the financial resources or a sufficient level of development activity to
justify the changes necessary for such an approach.)

"While the shift in attitude toward local land-use actions affecting

and substantially adopted in the Model Land Development Code.[34] It is embodied in recommenda-

specific parcels has been initiated largely by the judiciary, more flexible reform in this area could be brought about through legislative change. (See, *e.g.,* the ALI Model Land Development Code.)

"4. To assure a fair and impartial tribunal for 'quasi-judicial' actions, enabling legislation and local rules should be amended to limit prehearing or *ex parte* contacts between the parties to the action and the public officials involved, or to require that such contacts (excepting routine informational discussions with professional staff members) be on the record. This approach reduces the amount of lobbying or informal advocacy that often precedes the formal hearing and casts a shadow over the fairness of the entire proceeding.

"5. Judicial review of the grant or denial of individual requests for development permission should proceed on the record established in the hearing below in accordance with general principles of administrative law or as prescribed by statute, unless determined otherwise by the court. This approach seeks to avoid *de novo* review in such cases. Accordingly, the record established at the hearing would be called up and examined for errors without the court substituting its judgment for that of the lower body. The court could remand the case to the administrative body for a new hearing, additional findings, or other actions in accordance with traditional judicial functions in administrative law. The efforts of the courts would thereby be focused on the record and findings made below, and the importance of fair and rational local government action would be emphasized.

"6. The implementation of the procedural changes suggested in this chapter may impose additional administrative burdens on the plan commission, board of appeals, and legislative body. To lessen these administrative burdens, while at the same time assuring a more efficient and professional process, local governments should consider the creation of a hearing examiner system. The hearing examiner would hear and decide cases, subject to appeal to the local governing body, in conventional discretionary matters such as requests for variances, special permits, and subdivision plats. With regard to individual requests for rezonings of specific parcels, they too should be heard by the hearing examiner, with a complete record made of the proceedings. The hearing examiner's recommendations would then be submitted to the governing body, which would make the final decision on the basis of the record established before the examiner.

"The hearing examiner provides a mechanism for diverting administrative burdens and leaving the public official with time for the more important tasks of planning, policy formulation, and making final decisions on the record made before the hearing examiner. It must be recognized that instituting a hearing examiner system will involve *public costs and probably would be best justified in areas undergoing substantial development activity.*"

See *Housing For All Under Law, supra,* pp viii, 319-322.

[34] "(1) Notwithstanding the provisions of § 2-311, the local governing body may authorize development by a special amendment only if the

procedures of this Section are followed. A special amendment is an amendment

"(a) which results in a change limited in effect to a single parcel or to several parcels under related ownership; or

"(b) which changes regulations applicable to an area of [50] acres or less; or

"(c) which permits development specified in a previously adopted ordinance as permissible upon stated criteria after approval by the local governing body.

"(2) Prior to the adoption of a special amendment, the Land Development Agency shall hold a hearing in accordance with § 2-304 and make findings and recommendations on the issues presented in regard to the proposed amendment. A special amendment may be adopted only if

"(a) development at the proposed location is essential or especially appropriate in view of the available alternatives within or without the jurisdiction; or

"(b) the development is development of regional benefit under § 7-301(4); or

"(c) the development could have been granted a special development permit under Part 2 of this Article or under Article 7, whether or not the development ordinance before the amendment authorized the Land Development Agency to grant a permit on that basis; or

"(d) there was a mistake in the original ordinance in regard to the property.

"(3) Upon receipt of the findings and recommendations of the Agency, the governing body may, with or without an additional hearing, adopt the proposed amendment, or modify the proposed amendment and adopt it as modified. A local governing body may adopt a special amendment only if it finds that the amendment would satisfy the requirements of subsection (2). Any additional hearing by the governing body shall be conducted in accordance with § 2-305.

"(4) *The decision of the governing body to adopt a special amendment shall be supported by findings and conclusions based upon the record as if a special development permit had been granted.* In any judicial proceeding thereon, the findings and conclusions shall be those of the agency under subsection (2) unless the governing body, on the basis of the same record or a record prepared before it, makes other findings and conclusions." ALI, Model Land Development Code, § 2-312, pp 108-111 (emphasis supplied).

The Notes to § 2-312 explain that

"The Land Development Agency must hold a hearing and make specific findings and recommendations on the issues presented in regard to any special amendment. This hearing must be conducted as an administrative hearing under § 2-304, not as a legislative-type hearing under § 2-305. (Compare § 2-311[3].) In order to justify the grant of a special amendment it must be 'supported by findings and conclusions based upon the record as if a special development permit had been granted.' "

See, generally, Peterson, *Flexibility in Rezoning and Related Governmental Land Use Decisions,* 36 Ohio St L J 499 (1975).

tions for revisions of Michigan's zoning enabling acts[35] and was recently enacted with respect to applications for special land uses and planned unit developments.[36] That approach is premised on a perceived difference in the nature of the determination made by a local legislative body when it considers zoning changes pertaining to individual parcels of land:

> "Generally, when a municipal legislative body enacts a comprehensive plan and zoning code it acts in a policy making capacity. But in amending a zoning code, or reclassifying land thereunder, the same body, in effect, makes an adjudication between the rights sought by the proponents and those claimed by the opponents of the zoning change. The parties whose interests are affected are readily identifiable. Although important questions of public policy may permeate a zoning amendment, the decision has a far greater impact on one group of citizens than on the public generally."[37]

Just as the procedures followed by this Court, by courts in general, and by administrative bodies, vary depending on whether the court or agency is prescribing broad, prospective legislative-type rules or, in contrast, is adjudicating an individual case (whether civil or criminal), the procedures in zoning should be consonant with the nature of the function: where the function is adjudicative, concerning peculiarly the rights or property of a particular individual, the procedure should be such that the decision is based on pertinent evidence, to which interested parties have an oppor-

---

[35] See Office of Land Use, Zoning Advisory Committee, Michigan Department of Natural Resources, *Michigan's Zoning Enabling Acts— Recommendations for Revision,* pp 48-50, 65-68. See, also, Appendix A, Jan, 1977 Revision.

[36] See fn 16, *supra.*

[37] *Fleming v Tacoma, supra,* p 299.

tunity to respond, and it should be supported by an explanation of the reasons for decision.

Where a zoning change involves the interests of a discrete and limited number of property owners,[38] notice and hearing are required to give those whose interests are directly at stake an opportunity to present facts supporting those interests and reasons a particular parcel should or should not be rezoned.[39] The local zoning authority should be

---

[38] A change to permit development of a major shopping center, because of its long-term impact on the local government's resources available for capital improvements, its potential for influencing patterns of growth and its impact on a large number of landowners, may require a procedure that is an amalgam of administrative and legislative principles. Crawford, *supra,* p 856. *Cf. Developments in the Law —Zoning,* 91 Harv L Rev 1427, 1511 (1978).

[39] It has been said:

"The judicial deference to 'legislative' action by an administrative agency is based upon the concept that the agency is applying expertise in making a decision tantamount to either an expression of legislative policy or an exercise of legislative judgment based upon more or less general information relating to the area of its expertise. Thus the characteristics to be expected from a 'legislative' action are: (1) a broad base of general, non-quantifiable information; (2) the broad, non-particularized impact of an announcement of legislative policy; and (3) the exercise of broad discretion to select a policy to implement the objectives with which the administrative body is charged.

\* \* \*

"In the administrative setting an adjudicative action is based upon the facts of the particular case, facts which are capable of proof by judicial methods, and is generally limited in its immediate effect to particular individuals. It may or may not also involve an initial decision as to a general policy to be followed in similar cases. Similarly, it may or may not ultimately depend upon agency discretion rather than application of precise predetermined standards. The importance of the particular facts of the case and of the nature of those facts compels a much greater procedural standard to insure that individuals directly affected are given a fair opportunity not only to be heard but to prove their version of the particular facts as well." Booth, *supra,* pp 768-769.

It has also been said:

"It is an established constitutional principle that procedural due process attaches only to administrative or adjudicatory action by the state, and not to legislative action.

\* \* \*

"Two separate inquiries are necessary if administrative decisions

limited to a consideration of the record to assure
that there has been an opportunity to respond and
to avoid the appearance of unfairness which arises
from *ex parte* communications. A record (which
need not be a verbatim transcript but simply a
summary of the facts and arguments presented, or
a tape recording, and a file containing all written
documents) should be kept so that the local zoning
body can base its decision on the record, and so
that, upon review by a court, it can base its

are to be differentiated from legislative decisions in a manner that is
responsive in all cases to the due process interests in efficiency,
representation, and dignity. The first inquiry concerns the type of
underlying facts on which the decision is based. This examination
provides a reasonably clear and feasible means for distinguishing
policy decisions from specific applications of the policy. The second
inquiry considers whether the government action results in a differen-
tiable impact on specifiable individuals, thus making allowance for
the fact that new policies may be articulated through specific deci-
sions of limited applicability.

\* \* \*

"Identifying actions that are administrative by the nature of the
underlying facts and the particularity of the impact comports with
the functional analysis of procedural due process.

\* \* \*

"Amendments to general plans have not been dealt with uniformly
by the courts. Some jurisdictions have held that because the adoption
of the original plan is a legislative act, an amendment to it must also
be characterized as legislative. But many zoning amendments fit the
characteristics of administrative action. A zoning amendment gener-
ally proposes reclassification of a specific parcel of land, and involves
an inquiry into the desirability of a particular land use. The inquiry
will therefore frequently turn on facts concerning a specific situation
and will have a differentiated impact on particular individuals, thus
fulfilling both criteria for an administrative action. Some amend-
ments to general plans, however, are properly classified as legislative,
particularly where they are the result of a change in a basic policy
decision underlying the formulation of the original plan. For example,
a decision whether or not to amend a plan to permit multiunit
residential housing in a small, rural community will likely turn on a
policy debate over whether the town is now willing to accept the
consequences of growth and urbanization. Assuming that the decision
does not produce a differentiated impact, that certain people or
neighborhoods are not forced to bear the entire cost of the amend-
ment, implementation of the amendment need not be accompanied by
procedural safeguards." *Developments in the Law—Zoning, supra,* pp
1508-1513.

decision on the same record. Findings of fact and reasons for decision (which need not be formalized, legalistic documents) serve similar purposes.

Perhaps the most controversial aspect of the administrative analysis in Michigan has been the substantive standard of review suggested in the concurring opinion in *Kropf* and the majority opinion in *Sabo.* The proposition there offered was that "[e]ven if present zoning is not unreasonable or confiscatory, a proposed use should be permitted if reasonable under all the circumstances. *Kropf v Sterling Heights,* 391 Mich 139, 164; 215 NW2d 179 (1974) (concurring opinion)".[40]

We agree that the "reasonableness of the proposed use" standard lends itself to the substitution of a judicial judgment for that of the local legislative body, and that the scope of judicial review should be confined to determining whether (1) the decision of the local legislative zoning body conforms to the substantive standard for passing on · exceptions or zoning changes articulated and applied by the local legislative body; (2) the decision of the local legislative zoning body is "supported by competent, material and substantial evidence on the whole record";[41] (3) the procedures followed adequately protect the rights of those concerned;[42]

---

[40] *Sabo v Monroe Twp, supra,* pp 536-537.

[41] Const 1963, art 6, § 28.

[42] See Davis, Administrative Law Treatise (1976 Supp), § 7.00, p 242. It has been said that local units of government will be unable to follow such procedures because of the prohibitive costs and their lack of experience in conducting hearings, and that the procedures are inconsistent with participatory democracy. In response it must be conceded that there may be increased costs, but the experience in Oregon, for example, suggests that local units of government respond in a variety of innovative ways, avoiding the major expenses of verbatim transcripts and formal cross-examination, yet nevertheless following procedures assuring impartiality and fairness. See Platt, *Oregon v Michigan,* Newsletter, Real Property Law Section, St Bar of Mich (No 10, Dec, 1975). Formal trials are not required; procedures not much different from those prevailing in many communities are

(4) the decision was consistent with constitutional requirements of substantive due process and equal protection and with any master plan.[43]

## VI

In *Zaagman,* Ed Zaagman, Inc, the owner of a 17-acre undeveloped parcel of land in Kentwood, with a population of 25,300, sought to invalidate the city's zoning ordinance as applied and to have the parcel rezoned to permit use as a 97-site mobile home park.[44]

what is called for. To the extent informal citizen-legislator communication is decreased the process will be more precise, fair and protective of the rights of individuals. It is again pertinent that the Legislature has recently required administrative hearings on applications for special land uses and planned unit developments. See fn 16, *supra.*

[43] In *Sabo v Monroe Twp, supra,* pp 538-541, the Court was divided on the meaning of the statutory requirement, found in the zoning enabling acts, that zoning be in accordance with a "comprehensive plan". The majority (three justices) held that "plan" did not mean "master plan", but simply required that zoning be comprehensive, uniform and broad in scope. See Mandelker, *The Role of the Local Comprehensive Plan in Land Use Regulation,* 74 Mich L Rev 899, 902 (1976). See, also, authorities cited *id.,* p 904, fn 21. While it is desirable that master plans be adopted, since thereby planning will be facilitated and unnecessary discretion of local zoning bodies in considering rezoning proposals will be circumscribed, the failure to adopt a master plan does not invalidate an otherwise valid zoning regulation.

[44] There was some mention at trial of the non-feasibility of developing the property as zoned. Plaintiff's proofs at trial consisted of the testimony of two experts and of its owner Edward Zaagman.

The experts' testimony on this aspect was scanty: one expert said that he questioned "with the industrial on the north and the industrial on the east, whether the land would be—you would be able to get an economic return on the land to justify it [single-family development], but obviously that is my opinion". The second expert testified that a mobile home park would be the most suitable use for the parcel and that although it would be physically possible to develop the parcel in many ways, its highest and best use would be as a mobile home park.

Zaagman testified that after analyzing the costs of developing the parcel as zoned, he concluded that he could not economically build single-family homes, duplexes or garden apartments. He explained that since there was a relatively high demand for the few available mobile home sites in the area and since the industrial and mobile

The parcel is zoned R-3, permitting development of one- and two-family homes and, under certain circumstances, planned garden apartments.

In 1973 the landowner asked the city to rezone the property. The request was referred to the city planning commission, which, acting on a consultant's conclusion that a mobile home park would be undesirable because of traffic congestion, crowding of schools and other effects of asserted higher density, denied the request. The city refused rezoning.

This action was then commenced in circuit court seeking an injunction against enforcement of the ordinance with respect to the parcel and an order approving construction of a mobile home park.

Kentwood has four parcels zoned R-5, permitting mobile home park use. Three are fully developed, with a total of 673 mobile home pads, almost all of which were occupied. The fourth park was new, having 196 pads, 29 of which were vacant.

Existing mobile home parks covered 116 acres. There were about 870 mobile home sites, 5,220 single-family residences, 98 duplexes and almost 2,000 apartment units, with 700 additional units then under construction.

There were approximately 9,000 acres of vacant land in Kentwood zoned as follows: 1,000 agricultural; 1,600 single family; 4,300 in two kinds of

home parks that surrounded the parcel made it relatively undesirable for single-family use, the parcel was best suited for mobile homes.

Although the city did not dispute that the parcel was unsuitable for development as zoned, all statements on behalf of plaintiff regarding feasibility were in the form of conclusory opinions, unsupported by a factual predicate. Unlike the proofs in *Turkish,* here there was no effort to quantitatively support the claim that the ordinance was confiscatory because the sum of the costs of development, the basic speculative land value and a reasonable return would exceed the anticipated return.

zones permitting single- and double-family homes and garden apartments; 300 planned development; 300 commercial; and 1,500 industrial.

The Kentwood Land Use System Plan of 1973 called for 94 acres to be used for mobile home parks, 30 acres of which were not then zoned for mobile home park development.[45]

The relief requested was granted by the circuit court, a short time before *Kropf* was decided.[46] The Court of Appeals reversed on the authority of *Kropf.*

The landowner's proofs tended to show that the parcel was well-suited for use as a mobile home park. Zoning is not, however, unreasonable or unconstitutional simply because it does permit a use for which the land is suited.

The landowner also argued that the zoning is invalid because the ordinance in effect excludes[47]

---

[45] The 94 acres apparently does not include land currently used for mobile homes since 116 acres are already developed as mobile home parks.

[46] After the city filed a claim of appeal the judge, in an addendum to his bench-dictated opinion which was revised and filed after entry of the judgment and *Kropf* was decided, stated:

"After the above opinion had been edited and transcribed for filing, it was brought to this court's attention that on February 19, 1974, the Michigan Supreme Court reversed *Kropf v Sterling Heights,* 41 Mich App 21 [199 NW2d 567] (1972), by an opinion overruling the so-called 'preferred use' doctrine of *Bristow v City of Woodhaven,* 35 Mich App 205 [192 NW2d 322] (1971), and subsequent cases. This development may have a profound effect on the legal framework within which the subject case was decided and is brought to the attention of the parties in the event that they wish to consider post-trial proceedings."

No such proceedings were pursued.

[47] See, generally, Rubinowitz, *Exclusionary Zoning: A Wrong in Search of a Remedy,* 6 J of L Reform 625 (1973); Note, *The Inadequacy of Judicial Remedies in Cases of Exclusionary Zoning,* 74 Mich L Rev 760 (1976); Note, *Equal Protection and Exclusionary Zoning,* 60 Va L Rev 163 (1974); Kaye, *The Validity of Zoning an Entire Municipality Exclusively Residential,* 7 Urban L Ann 304 (1974); Comment, *Removing the Bar of Exclusionary Zoning to a Decent Home,* 32 Ohio St L J 373 (1971); Bigham & Bostick, *Exclusionary Zoning Practices: An Examination of the Current Controversy,* 25 Vanderbilt L Rev 1111 (1972); Zumbrun & Hookano, *No-Growth and Related Land-Use*

mobile home development from the city as a whole.[48]

While local units of government may, pursuant to the police power granted by the Legislature, regulate land use, they may not preclude all growth nor may they entirely exclude a particular kind of residential development. Zoning and other land use regulations may properly be designed to facilitate planned growth, and development to protect the public health and safety, permit governmental services to keep pace with development and to retain some of the aesthetic and environmental values which might otherwise be lost. Put simply, "[z]oning is a means by which a governmental body can plan for the future—it may not be used as a means to deny the future".[49]

---

*Legal Problems: An Overview,* 9 Urban Lawyer 122, 132, 143-156 (1977); Note, *The Equal Protection Clause and Exclusionary Zoning After Valtierra and Dandridge,* 81 Yale L J 61 (1971); Note, *Exclusionary Zoning and Equal Protection,* 84 Harv L Rev 1645 (1971); Lyon, *Exclusionary Zoning From a Regional Perspective,* 5 Urban L Ann 239 (1972); Hirshon, *The Interrelationship Between Exclusionary Zoning and Exclusionary Subdivision Control,* 5 J of L Reform 351 (1972); Branfman, Cohen & Trubek, *Measuring the Invisible Wall: Land Use Controls and Residential Patterns of the Poor,* 82 Yale L J 483 (1973); Symposium, *Exclusionary Zoning,* 22 Syracuse L Rev 465 (1971); Note, *The Use of Zoning Laws to Prevent Poor People From Moving to Suburbia,* 16 Howard L J 351 (1971); Note, *The Constitutionality of Local Zoning,* 79 Yale L J 896 (1970).

[48] See Flippen, *Constitutionality of Zoning Ordinances Which Exclude Mobile Homes,* 12 Am Bus L J 15 (1974); Note, *Housing—Mobile Homes—Some Legal Questions,* 75 W Va L Rev 382 (1973); Sunde, *The Presumption of Validity of Mobile Homes as a Preferred Use,* 7 Urban L Ann 296 (1974); Moore, *The Mobile Home and the Law,* 6 Akron L Rev 1 (1973); Van Iden, *Zoning Restrictions Applied to Mobile Homes,* 20 Cleveland St L Rev 196 (1971).

See, also, *Southern Burlington County NAACP v Mount Laurel Twp,* 67 NJ 151; 336 A2d 713 (1975); *United Farmworkers of Florida Housing Project, Inc v Delray Beach,* 493 F2d 799 (CA 5, 1974); *Metropolitan Housing Development Corp v Village of Arlington Heights,* 517 F2d 409 (CA 7, 1975), but *cf. San Antonio Independent School Dist v Rodriguez,* 411 US 1, 28, 29; 93 S Ct 1278; 36 L Ed 2d 16 (1973).

[49] *National Land & Investment Co v Easttown Twp Board of Adjustment,* 419 Pa 504, 527-528; 215 A2d 597 (1965). Similarly, see *Golden*

Where a unit of government in effect singles out for exclusion one or more forms of land use, either directly or indirectly (by, for example, permitting uses which few of the persons seeking to use the land can afford), a question may arise whether a legitimate governmental interest is being advanced.

There were no undeveloped R-5 zones in the city. In the four developed R-5 zones there were approximately 870 sites, with about 30 vacant. Less than 1% of the acreage in the city was devoted to mobile home park use. The percentage of mobile home units to total dwelling units was substantially less than in some nearby communities.

The mayor testified, however, that the ordinance was being revised to provide for a "fairly substantial mobile home area in an entirely different section of the city". Such an area is shown on the city's general development plan.

Justice WILLIAMS has written:

"While mobile home parks are not a guaranteed constitutional use, they are necessary to the essential human problem of low-cost shelter. Legislatively and judicially, as a lawful land use, they deserve protection from discrimination by exclusionary zoning."[50]

Given fundamental demographic changes, particularly in the availability and affordability of single-family homes, mobile homes may have become the only feasible means for persons of modest means to own and live in a single-family resi-

v Planning Board of Ramapo, 30 NY2d 359, 379; 285 NE2d 291; 334 NYS2d 138 (1972).

See, also, Dequindre Development Co v Warren Charter Twp, 359 Mich 634, 640; 103 NW2d 600 (1960); Nickola v Grand Blanc Twp, supra, p 608; Kirk v Tyrone Twp, supra.

[50] Nickola v Grand Blanc Twp, supra, p 608.

dence.[51] Today's mobile home parks differ from yesterday's trailer camps. In addition to paved streets, sidewalks, central recreational facilities and other conveniences of modern suburban living, the homes may be larger and better constructed and designed than some conventionally constructed single-family homes.[52]

Yet there has been a persistent reluctance on the part of some municipalities to permit the development of mobile home parks, sometimes because of a legitimate concern regarding overpopulation or the adequacy of services, sometimes because of concern for aesthetics, and sometimes because of an unexpressed desire to exclude the kind of persons thought to reside in them.

We are not, however, faced with a prohibition of a " 'constitutionally' recognized use" giving rise to a *"prima facie* case placing a heavy burden on the municipality to justify the local legislation".[53] Nor,

---

[51] See Babcock & Bosselman, *Exclusionary Zoning: Land Use Regulation and Housing in the 1970's* (NY: Praeger Publishers, Inc., 1973), pp 8-9.

[52] See Neithercut, *The Mobile Home: Problems With its Recognition as a Valid Housing Source,* Newsletter, Real Property Section, St Bar of Mich (No 10, Dec, 1975), p 15.

The author notes that in December, 1975 there were more than five million mobile homes and that "[o]ne-half of all housing starts are now mobile homes and 95% of all homes built for less than $15,000 are mobile homes. * * * Eighty percent of mobile homes are in mobile home parks. * * * One thousand new parks a year are opened which offer over 100 unit sites."

"Mobile homes are built more like houses than mobile vehicles. * * * They are fully insulated and wired[,] with adequate plumbing also. * * * The largest mobile homes are 14 feet wide by 75 feet long which equals or surpasses the 900 square feet size of the average new single family [home] insured by the FHA.

"While mobile homes were originally for transient purposes, today about 60% of all mobile home owners never move their home. The MHMA [Mobile Home Manufacturers' Association] reports that the average stay in one location by mobile home owners is 58 months, which is approximately the same residency duration as in conventional housing. About 70% of the mobile homes used since WW II have been used as permanent dwellings." *Id.,* p 25.

[53] *Kropf v Sterling Heights, supra,* p 155. See, also, *Gust v Canton*

unlike *Nickola*,[54] is there a suggestion that the city has refused all new applications for mobile home use, making the prospect of future mobile home park development elsewhere in the city illusory.

Absent any showing that there is a pattern of refusals of applications where property is suited for mobile home use, or any indication that the planning commission or city commission does not consider each application on its merits and acts in accordance with an unspoken plan to deny such applications, the ordinance is not exclusionary, and the failure to permit *a* parcel to be used for mobile homes, although well suited for that purpose, does not justify a conclusion that the ordinance as applied to that parcel is unconstitutional.

KAVANAGH, J., concurred with LEVIN, J.

---

*Twp*, 342 Mich 436; 70 NW2d 772 (1955).

[54] *Nickola v Grand Blanc Twp, supra*, pp 612-613.